IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-50787
_____

SOUTHWESTERN BELL TELEPHONE CO.,

Plaintiff-Appellant,

versus

PUBLIC UTILITY COMMISSION OF TEXAS; PAT
WOOD III; JUDY WALSH; BRETT PEARLMAN;
TIME WARNER COMMUNICATIONS OF AUSTIN,
L.P.; TIME WARNER COMMUNICATIONS OF
HOUSTON, L.P.; AND FIBRCOM, INC.,

Defendants-Appellees.

-------------
Appeal from the United States District Court
for the Western District of Texas
-------------
March 30, 2000

Before WIENER and STEWART, Circuit Judges.[1]

WIENER, Circuit Judge.

This appeal involves a dispute between two interconnecting telephone companies ("carriers") in the same local calling areas about whether modem calls placed by local customers of one carrier to the Internet Service Provider ("ISP") customers of another carrier should be charged for as a "local" call. The contracts between the carriers that are parties to this appeal specify that local calls placed by customers of one carrier to customers of the other are to be "reciprocally compensated." In the district court, Plaintiff-Appellant Southwestern Bell Telephone Co. ("Southwestern Bell") disavowed any obligation to compensate Defendants-Appellees Time Warner Communications of Austin, L.P. (collectively "Time Warner"), for calls made by Southwestern Bell's customers to Time Warner's ISP customers as local calls. The district court, like the Texas Public Utilities Commission

_____

[1]Senior District Judge John M. Shaw of the Western District of Louisiana was a member of the panel who heard oral argument on this case. Because of his death on December 24, 1999, he did not participate in this decision. This appeal has been decided by a quorum pursuant to 28 U.S.C. §46(d).

("PUC") before it, held that the carriers' contracts require such calls to be treated as local calls and as such, to be compensated for reciprocally. The procedural history of this case also presents thorny jurisdictional questions at the state regulatory commission and federal district court levels. Concluding that the PUC and the district court had jurisdiction to adjudicate the merits of this case, and agreeing with their dispositions of it, we affirm.

I.

FACTS AND PROCEEDINGS

In the interest of opening previously monopolistic local telephone markets to competition, the Federal Telecommunications Act of 1996 (the "Act") requires all telecommunications carriers to interconnect their networks so that customers of different carriers can call one another. 47 U.S.C. § 251(a)(1) (West Supp. 1999). Both Southwestern Bell and Time Warner are local exchange carriers ("LECs"). Having historically held monopolies in the subject markets, Southwestern Bell is the incumbent LEC or ILEC, and Time Warner is a competing LEC or CLEC. The Act requires ILECs to negotiate reciprocal compensation arrangements or interconnection agreements with CLECs to establish the terms by which they will compensate each other for the use of the other's networks. 47 U.S.C. § 251(b)(5), (c)(1). When an LEC's customer places a local call to a customer of another LEC, the LEC whose customer initiated the call compensates the receiving LEC for transporting and terminating the call through its network. *See* 47 U.S.C. § 251(b)(5); 47 C.F.R. § 51.701(e) (1998).

In two reciprocal compensation agreements (one executed in 1996 and the other in 1997), Time Warner and Southwestern Bell agreed to base reciprocal compensation on minutes of use. That way each party would pay the other a fixed rate for each minute that one of its customers used the other's network for "Local Traffic." The instant dispute originated when Southwestern Bell refused to pay Time Warner reciprocal compensation for modem calls that Southwestern Bell's customers made to Time Warner's ISP customers. ( ISPs typically purchase local business phone service from LECs for a flat monthly fee that allows unlimited incoming calls.) An Internet user can, through use

2

of a modem, dial an ISP's local phone number without incurring long-distance tolls, but can nevertheless access websites around the globe. Southwestern Bell based its refusal to pay reciprocal compensation to Time Warner on the theory that, because modem calls to ISPs involve the continuous transmission of information across state lines, such calls are interstate and thus should not be billed as Local Traffic.

In response, Time Warner filed a complaint with the PUC alleging that Southwestern Bell breached its interconnection agreements when it refused to pay reciprocal compensation for those calls that its customers made to Time Warner's ISP customers. The PUC sided with Time Warner, ruling that calls made by Southwestern Bell's customers to Time Warner's ISP customers are Local Traffic, and as such generate reciprocal compensation obligations.

Southwestern Bell then sought relief in the district court, continuing to insist that Internet calls are not "local" and therefore should not fall under the reciprocal compensation provisions of the interconnection agreements applicable to local calls. The district court upheld the PUC's decision, agreeing that, under the interconnection agreements, "Local Traffic" includes calls to ISPs. Both the PUC and the district court were impressed by the notion that a "call" from a Southwestern Bell's customer to a Time Warner ISP customer terminates locally at the ISP's facility. They considered such *telecommunication* service to be a component of the call separate and distinct from the *information* service, which begins at the ISP's facility and continues to distant websites.

Subsequent to the filing of this appeal, the FCC handed down a ruling pertinent to reciprocal compensation for ISP-bound calls, entitled *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Inter-Carrier Compensation for ISP-Bound Traffic*, 14 F.C.C.R. 3689 (1999) (the "Reciprocal Compensation Ruling"). Holding that it has jurisdiction over calls to ISPs as interstate calls, the FCC declined to separate ISP-bound traffic into two distinct components (intrastate telecommunications service, provided by the LEC, which goes from a user's modem to the local ISP, and interstate information service, provided by the ISP, which goes from the ISP to the websites). Reciprocal Compensation Ruling ¶¶ 1, 13. Although the FCC determined the

3

jurisdictional nature of the ISP-bound traffic by the end-to-end analysis of the transmission (from the user to the Internet), it held that LECs are nevertheless controlled by interconnection agreements that include ISP-bound traffic in their reciprocal compensation provisions in the same manner as they include other local traffic. Id. ¶¶ 13, 16, 18, 22-24. Taking a hands-off approach, the FCC announced that it will not interfere with state commission determinations of whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic. *Id.* ¶¶ 21-22.[2]

II.

ANALYSIS

A.      Jurisdiction

The substantive question that we are asked today is whether, for purposes of one LEC paying reciprocal compensation to another, a call from the first LEC's customer to the second LEC's ISP customer in the same local exchange area is "Local Traffic" as the term is used in these LECs' interconnection agreements. Before addressing that question, though, we must answer several questions regarding jurisdiction.

The easy one is appellate jurisdiction: We clearly have it under 28 U.S.C. § 1291. Jurisdictional questions arising from the presence of this case first before the PUC and subsequently before the district court are not so simple.

As a general proposition, jurisdiction to entertain such matters is conferred on the district court by the judicial review provisions of the Act, which state:

_____

[2]Less than a week ago the Court of Appeals for the District of Columbia decided Bell Atlantic Telephone Companies v. FCC, 2000 WL 273383 (D.C. Cir) March 24, 2000, vacating this ruling and remanding it to the FCC with instructions to provide a satisfactory explanation why LECs that terminate calls to ISPs are not properly seen as terminating local telecommunications traffic, and why such traffic is "exchange access" rather than "telephone exchange service." The focus of that opinion is the unexplained (or underexplained) use of the "end-to-end" analysis to determine whether calls to ISPs are interstate or intrastate. Given the FCC's hands-off policy, even if the FCC should continue to deem such calls to be interstate and should satisfy the D.C. Circuit following remand, we do not view the court's remand as necessarily forecasting a different result on the question of PUC jurisdiction over such calls in the context of interpreting and enforcing existing reciprocal compensation agreements. This would be doubly so if the remand eventually results in the FCC's concluding that local calls to ISPs are intrastate.

4

> In any case in which *a State commission makes a determination under this section*, any party aggrieved by such determination may bring an action in an appropriate Federal district court *to determine whether the agreement* or statement *meets the requirements of section 251 of this title and this section* [252].

47 U.S.C. § 252(e)(6) (emphasis ours).[3]  With respect to the interconnection agreements, the Act confers jurisdiction on the district court to review the PUC's determination for compliance with the Act, specifically sections 251 and 252.  Our chore today is to determine whether the Act, which admittedly provides for federal district court review of some state commission dispositions implicating interconnection agreements, provides for such review in this instance.  This determination comprises two parts:  (1) the PUC's own jurisdiction to determine the questions presented to it, and (2) the scope of federal review.  As to the first part, the Act provides commission jurisdiction in cases "in which a State commission makes a determination under this section," meaning section 252.  That section sets forth procedures for negotiation, arbitration, and approval of interconnection agreements.  It also requires LECs to enter into interconnection agreements with each other, through either voluntary negotiation or compulsory arbitration.  47 U.S.C. § 252(a), (b).  The Act specifies that, regardless of how they are confected, all interconnection agreements must be approved by the appropriate state commission.  47 U.S.C. § 252(e)(1).  Here, the parties had voluntarily negotiated their interconnection agreements, and the PUC had approved them; no one is  here seeking district court review of those approvals.   It was not until several months after the PUC granted its approvals that Time Warner filed the complaint with the PUC pertaining to reciprocal compensation under those agreements, precipitating the declaratory action in federal court and ultimately this appeal.

The Act's reference to "a State commission . . . determination under this section [252]," could, if  construed quite narrowly, limit state commission jurisdiction to decisions approving or disapproving, or arbitrating, an interconnection agreement.  Under such a narrow construction, commission jurisdiction would not extend to interpreting or enforcing a previously approved contract.

---

[3] The mention of a statement refers to "a statement of the terms and conditions that [an LEC] generally offers within that State to comply with the requirements of section 251."  47 U.S.C. § 252(f)(1).

5

We do not think so narrow a construction was intended. Rather, we are satisfied that the Act's grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements that state commissions have approved. *See Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 804 (8th Cir. 1997), *aff'd in part, rev'd in part on other grounds*,[4] *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed.2d 835 (1999). We believe that the FCC plainly expects state commissions to decide intermediation and enforcement disputes that arise after the approval procedures are complete. *See, e.g.,* Reciprocal Compensation Ruling ¶ 22 (noting that parties are bound by their interconnection agreements "as *interpreted and enforced* by the state commissions") (emphasis ours); *id.* ¶21 (referring to state commission "findings" as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic); *id.* ¶ 24 (discussing factors state commissions should consider when "construing the parties' agreements"); *see also Illinois Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566, 573 (7th Cir. 1999) (noting that in determining contractual intent under interconnection agreements, a state commission "was doing what it is charged with doing" in the Act and the FCC's Reciprocal Compensation Ruling). Deferring to the pronouncements of the FCC and its reasonable interpretations of the Act, *see, e.g., Illinois Bell Tel. v. WorldCom,* 179 F.3d at 571, we hold that the PUC acted within its jurisdiction in addressing the questions pertaining to interpretation and enforcement of the previously approved interconnection agreements at issue here.

Southwestern Bell poses yet another challenge to the PUC's jurisdiction, urging that, because Internet traffic is interstate, as a matter of federal law state commissions such as the PUC lack jurisdiction to impose reciprocal compensation liability for such traffic. We disagree. The Supreme

---

[4]The part of the Circuit Court's decision eventually reversed pertained to the conclusion that the FCC does not have jurisdiction under 47 U.S.C. § 208 to hear appeals of state commission decisions (and that 47 U.S.C. § 252(e)(6) confers this power exclusively on federal district courts). *Iowa Utils.*, 120 F.3d at 804. The Supreme Court reversed in part, ruling that the issue was not yet ripe for review. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S. Ct. 721, 733, 142 L. Ed.2d 834 (1999).

6

Court has recognized that the Act cannot divide the world of domestic telephone service "neatly into two hemispheres," one consisting of interstate service, over which the FCC has plenary authority, and the other consisting of intrastate service, over which the states retain exclusive jurisdiction. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360, 106 S. Ct. 1890, 1894, 90 L. Ed. 2d 369 (1986). Rather, observed the Court, "the realities of technology and economics belie such a clean parceling of responsibility." Id. The FCC too has rejected the argument advanced by Southwestern Bell, noting that "state commission authority over interconnection agreements pursuant to section 252 'extends to both interstate and intrastate matters.'" Reciprocal Compensation Ruling ¶ 25, quoting *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order*, 11 F.C.C.R. 15499 ¶ 84 (1996). Accordingly, we hold that here the PUC properly exercised its jurisdiction regardless of any interstate aspect of the subject telecommunications.[5]

We also hold that the district courts have jurisdiction to review such interpretation and enforcement decisions of the state commissions. *See Iowa Utilities Bd.*, 120 F.3d at 804 & n.24 (holding that federal court review in section 252(e)(6) encompasses review of enforcement decisions of state commissions and is the exclusive means of obtaining review of such determinations). We will not read section 252(e)(6) so narrowly as to limit its grant of federal district court jurisdiction to review decisions of state commissions only to those decisions that either approve or reject interconnection agreements. We conclude that federal court jurisdiction extends to review of state commission rulings on complaints pertaining to interconnection agreements and that such jurisdiction is not restricted to mere approval or rejection of such agreements. *See also Illinois Bell Tel. v. Worldcom,* 179 F.3d at 571 (recognizing exclusive federal jurisdiction to review "actions" by state commissions).

---

[5]The district court was of the opinion that if calls to ISPs were not local, the PUC would have no jurisdiction, and jurisdiction would be exclusive in the FCC. This was erroneous but harmless dicta, because the district court ultimately concluded, as we do today, that the PUC had jurisdiction.

7

A similar jurisdictional question asks whether subsection 252(e)(6) limits federal review of a state commission's actions with respect to an interconnection agreement to those commission decisions that concern only compliance with the requirements of sections 251 and 252 of the Act, and does not extend to review of a commission's actions implicating compliance with state law. In this case the parties have framed issues of both federal and state law. Our focus, however, concerns only the clause of the Act granting jurisdiction over an "action . . . *to determine whether the agreement . . . meets the requirements of section 251 [and section 252].*" 47 U.S.C. § 252(e)(6). Time Warner urges us to read section 252(e)(6) literally and narrowly, so as to limit federal review to only the issue whether the interconnection agreements, as interpreted by the PUC, meet the requirements of federal law, specifically, sections 251 and 252. These sections impose specific fair compensation requirements.[6] Under such a narrow construction, section 252(e)(6) would limit federal court review of the PUC's decision to such questions as whether the PUC's interpretation of the Time Warner/Southwestern Bell interconnection agreements adequately allow the parties to recover their costs. A federal court lacks jurisdiction, insists Time Warner, to address state law matters such as, for example, a contractual dispute regarding meeting of the minds.

The Act obviously allows a state commission to consider requirements of state law when approving or rejecting interconnection agreements. 47 U.S.C. § 252(e)(3), (f)(2). But whether, in addition to jurisdiction to review for compliance with requirements of the Act, a federal court is authorized to review any and every question of state law that a state commission may have addressed

---

[6]For example, the Act requires that
> a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless —
>> (I) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other character; and
>> (ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

47 U.S.C. § 252(d)(2)(A).

8

is an issue on which the circuits are split. The Seventh Circuit takes the position that in examining a state commission order, the court's task is "not to determine whether [state commission] correctly applied principles of state contract law, but to see whether its decision violates federal law, as set out in the Act or in the FCC's interpretation." *Illinois Bell Tel. v. Worldcom,* 179 F.3d at 572. Under this reading, our scope of review would be quite narrow indeed; the only issue before us would be whether the PUC, in determining that the parties intended for calls to ISPs to be subject to reciprocal compensation, violated federal law. *See id.* at 571. Any issues of state law, such as contract interpretation, would remain open for determination in another forum.[7] The Seventh Circuit also finds significant the contrast in the Act between state commission determinations (subsections 252(e)(3)( and (f)(2), allowing consideration of state law questions) and federal court determinations (subsection 252(e)(6), allowing consideration of only "whether the agreement or statement meets the requirements of section 251 and this section"). To the Seventh Circuit, this juxtaposition confirms that federal courts "may review a state commission's actions with respect to an agreement *only for compliance with the requirements of § 251 and § 252 of the [FTA], and not for compliance with state law.*" *MCI Telecomms. Corp. v. Illinois Commerce Comm'n*, 168 F.3d 315, 320 (7th Cir.) (emphasis ours), *amended on reh'g by* 183 F.3d 558 (7th Cir.), *reh'g granted*, 183 F.3d 567 (7th Cir. 1999)(on Eleventh Amendment grounds).

The Ninth and Fourth Circuits have taken a more expansive view of federal jurisdiction under the Act, narrowed only by the proper standard of review. These circuits would permit district courts to consider *de novo* whether the agreements are in compliance with the Act and the implementing

---

[7]The Seventh Circuit recognized that this allocation of authority "has a potential to cause problems," but would leave them to Congress to resolve:

> Federal jurisdiction under § 252(c)(6) is exclusive when it exists. Thus every time a carrier complains about a state agency's action concerning an agreement, it must start in federal court (to find out whether there has been a violation of federal law) and then may move to state court if the first suit yields the answer "no." This system may not have much to recommend it, but, as the Supreme Court observed in *Iowa Utilities Board*, the 1996 Act has its share of glitches, and if this is another, then legislature can provide a repair.

*Illinois Bell Tel. v. Worldcom*, 179 F.3d at 574 (Westmate* version only).

9

regulations, but to review all other issues decided by a state commission under a more deferential standard, either arbitrary and capricious or substantial evidence. *See US West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117, 1124 n.15 (9th Cir. 1999) (considering *de novo* agreement's compliance with the Act and regulations and considering "all other issues" under arbitrary and capricious standard); *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir. 1999) (reviewing *de novo* the state commission's interpretations of the Act and reviewing state commission fact finding under the substantial evidence standard).[8]

In the case now before us, the district court embraced the broader view, considering *de novo* whether the agreements comply with sections 251 and 252, and reviewing "all other issues" under an arbitrary-and-capricious standard. We find this approach appropriate. This standard comports with *United States v. Carlo Bianchi and Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L. Ed 2d. 652 (1963), and *Abbeville General Hospital v. Ramsey*, 3 F.3d 797, 802-03 (5th Cir. 1993) (conducting de novo review of procedural question whether state agency made finding required by federal law and arbitrary-and-capricious review of the findings themselves). We shall therefore review *de novo* whether the interconnection agreements as interpreted by the PUC meet the requirements of the Act, but our review of the PUC's state law determinations will be under the more deferential arbitrary-and-capricious standard.

B.      The Merits

We first examine the PUC order to see whether it violates federal law, as reflected in the Act and in the FCC's regulations or rulings. We conduct this examination *de novo*.

The PUC concluded that "a call between two end users in the same local calling area is local traffic." Agreeing with the FCC's then-prevailing view that providing of Internet service involved

---

[8]The Fourth Circuit expressed its awareness that other courts have used the "arbitrary and capricious" standard of review, quoting, inter alia, *U.S. West v. MFS Intelenet*, 193 F.3d at 1116, but stated that, as regarding review of fact findings, "there is no meaningful difference between this standard and the substantial evidence standard we apply." *GTE South*, 199 F.3d at 745 n.5.

"multiple components,"[9] the PUC declared that "it is the telecommunications service component, rather than the information service component, that constitutes the basis for determining the jurisdiction of the traffic involved in calls to ISPs. When a transmission path is established between two subscribers in the same mandatory calling area, traffic carried on that path is local traffic, with the telecommunications service component of the call terminating at the ISP location."

The FCC has now definitively established that modem calls to ISPs constitute jurisdictionally mixed, largely interstate, traffic. Reciprocal Compensation Ruling ¶¶ 1, 13, 18-19. In its 1999 ruling, the FCC concluded that ISP-bound traffic for "jurisdictional purposes [is] a continuous transmission from the end user to a distant Internet site." *Id*. ¶ 13. Having thus determined its own jurisdiction over ISP calls, the FCC then discussed regulation of the calls, beginning with the proclamation that it "has no rule governing inter-carrier compensation for ISP-bound traffic." *Id.* ¶ 9. The FCC continued: "We find no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic, pending adoption of a rule establishing an appropriate interstate compensation mechanism." *Id*. ¶ 21.[10] The FCC reasoned that "parties should be bound by their existing interconnection agreements, as interpreted by state commissions." *Id*. ¶ 1.

Clearly, then, whether voluntarily negotiated or confected through arbitration, commission-approved agreements requiring payment of reciprocal compensation for calls made to ISPs do not conflict with §§ 251 and 252 of the Act or with the FCC's regulations or rulings. Even if ISP traffic is largely interstate, a state commission may lawfully interpret an agreement as requiring reciprocal compensation for such traffic. *See id.* at ¶ 26 ("Although reciprocal compensation is mandated under

---

[9]The PUC quoted the FCC's *Report and Order on Universal Service*, CC Docket No. 96-45, FCC 97-157 at ¶ 83 (1997), noting, however, that the FCC had recognized that its position should be reviewed in a future FCC proceeding.

[10]In the Reciprocal Compensation Ruling, the FCC gave notice of a proposed rulemaking regarding inter-carrier compensation for ISP-bound traffic. The obligation to pay such compensation in existing interconnection agreements could be altered by future rules promulgated by the FCC. *See U.S. West v. AFS Intelenet*, 193 F.3d at 1123 n.10.

11

section 251(b)(5) only for the transport and termination of local traffic, neither the statute nor our rules prohibit a state commission from concluding in an arbitration that reciprocal compensation is appropriate in certain instances."); *Illinois Bell Tel. v. Worldcom*, 179 F.3d at 572 ("The FCC could not have made clearer that . . . a state agency's interpretation of an agreement so as to require payment of reciprocal compensation does not necessarily violate federal law.").

Additionally, the FCC acknowledged that it had historically "directed states to treat ISP traffic as if it were local." Reciprocal Compensation Ruling ¶ 21. Nothing in the Reciprocal Compensation Ruling prohibits a call from being "a local call for some, but not all, purposes." *Illinois Bell Tel. v. Worldcom*, 179 F.3d at 574. Finally, the FCC understood that its "policy of treating ISP-bound traffic as local for purposes of interstate access charges would, if applied in the separate context of reciprocal compensation, *suggest that [reciprocal] compensation is due for that traffic.*" Reciprocal Compensation Ruling ¶ 25 (emphasis added).

Accordingly, we hold that the PUC's determination that reciprocal compensation obligations encompass ISP-bound traffic does not conflict with the Act or with any FCC rule regarding such traffic. As the Seventh Circuit observed,

> The FCC could not have made clearer its willingness—at least until the time a rule is promulgated—to let state commissions make the call. We see no violation of the Act in giving such deference to state commissions; in fact, the Act specifically provides state commissions with an important role to play in the field of interconnection agreements. . . . In short, nothing in what the [state commission] said violates federal law in existence at this time.

*Illinois Bell Tel. v. Worldcom*, 179 F.3d at 574. It follows that we should affirm the district court's ruling that the order of the PUC did not violate federal law.

That brings us to the substantive question whether the PUC correctly interpreted the interconnection agreements. A threshold issue bearing on our standard of review is whether federal or state law controls this interpretation.[11] We therefore begin by examining how the state law issues

---

[11]As determined above, we review the interconnection agreements for compliance with the Act *de novo*, and for compliance with state law matters under the more deferential abuse of discretion standard.

pertaining to the interpretation of contracts relate to the Act and to FCC pronouncements, for example, with respect to the definitions of key terms such as "local" and "terminate."

Southwestern Bell contends that the proper understanding of these contracts turns on whether Internet communications are "local" under federal law and that the definition of "local traffic" in section 251(b)(5) of the Act should govern the contract. In another argument Southwestern Bell urges that the Act and the FCC's rulings on whether reciprocal compensation is required for Internet traffic determine whether, as a matter of federal law, reciprocal compensation is due under the contracts. Southwestern Bell argues that the language in the agreements[12] parallels the reciprocal compensation requirement in section 251(b)(5) of the Act[13]; that the FCC has declared that Internet traffic is not encompassed within section 251(b)(5) of the Act[14]; ergo, as a matter of federal law, the calls are not "local" and reciprocal compensation is therefore not required. We disagree.

As the Seventh Circuit said, in succinctly rejecting a similar argument, "[t]he syllogism is an oversimplification."

> That the Act does not require reciprocal compensation for calls to ISPs is not to say that it prohibits it. The Act simply sets out the obligations of all local exchange carriers to provide for reciprocal compensation. . . . Then in § 252(d)(2) state commissions are instructed that terms and conditions for reciprocal compensation are not to be considered reasonable unless they provide "for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier" and that the costs be determined on the basis of a "reasonable approximation of the additional costs of terminating such calls." The Act clearly does not set out specific *conditions which one party could enforce* against the other. *The details are left to the parties, or the commissions, to work out.*

---

[12]Under both agreements, reciprocal compensation applies to transport and termination of "Local Traffic."

[13]Section 251(b)(5) imposes on LECs the duty "to establish reciprocal compensation arrangements for the transport and termination of telecommunications."

[14]In the Reciprocal Compensation Ruling, the FCC concluded that "ISP-bound traffic is non-local interstate traffic," and noted that "the reciprocal compensation requirements of section 251(b)(5) of the Act and Section 51, subpart H (Reciprocal Compensation for Transport and Termination of Local Telecommunications Traffic) of the Commission's rules do not govern inter-carrier compensation for this traffic." Reciprocal Compensation Ruling n. 87.

13

*Illinois Bell Tel. v. Worldcom*, 179 F.3d at 573 (emphasis added). The FCC expressly ruled that "parties may voluntarily include [ISP-bound] traffic within the scope of their interconnection agreements under sections 251 and 252 of the Act, even if these statutory provisions do not apply as a matter of law. Where parties have agreed to include this traffic . . . they are bound by those agreements, as interpreted and enforced by the state commissions." Reciprocal Compensation Ruling ¶ 22.

In light of the foregoing, we hold that the agreements themselves and state law principles govern the questions of interpretation of the contracts and enforcement of their provisions. We therefore decline Southwestern Bell's invitation to determine the contractual issues as a facet of federal law.[15] Also, in accordance with the standards discussed above, we defer to the PUC's determinations on such issues, upholding them unless they are arbitrary and capricious or unsupported by substantial evidence.

As for interpretation of the contracts, we begin by noting that the Time Warner/Southwestern Bell interconnection agreements require the payment of reciprocal compensation for "Local Traffic." "Local traffic" is defined by the agreements as traffic that both "originates" and "terminates" in the same local calling area.[16] Where a modem call "originates" is not disputed. In contrast, where such a call to an ISP "terminates" is the nub of the argument.

The agreements neither define "terminate" nor specifically mention the Internet or ISPs. Southwestern Bell insists that the term "Local Traffic" does not include modem calls to ISPs because

---

[15]Although we may refer to FCC pronouncements as part of our consideration of what is usage or custom in the telecommunications industry, we do so only as the contracts and state law might require.

[16]"Local Traffic" is defined in the first agreement as "traffic which originates and terminates within a [Southwestern Bell] exchange including mandatory local calling arrangements. Mandatory Local Calling Area is an arrangement that requires end users to subscribe to a local calling area beyond their basic exchange serving area." The second agreement provides similarly that "Local Traffic, for purposes of intercompany compensation, is if (i) the call originates and terminates in the same [Southwestern Bell] exchange area; or (ii) originates and terminates within different [Southwestern Bell] Exchanges that share a common mandatory local calling area."

14

they do not terminate locally at the ISP's facility; however, both the PUC and the district court determined that such calls do terminate at the ISP facility.

Under Texas law, unambiguous contracts must be enforced as written, with the intent of the parties being derived from the agreement itself. *Intratex Gas Co. v. Puckett*, 886 S.W.2d 274, 277-78 (Tex. App.-El Paso 1994). The first agreement between these parties specifies that calls "originated by one Party's end users and *terminated to the other Party's end users* shall be classified as Local Traffic under this Agreement if the call originates and terminates in the same [Southwestern Bell] exchange area . . . or originates and terminates within different [Southwestern Bell] exchanges which share a common mandatory local calling area." An "End User" is defined as "a third-Party residence or business that subscribes to telecommunications services provided by either of the Parties." The parties' second agreement adds the phrase "or by another telecommunications service provider."

These contractual provisions lend additional support to the conclusions of the PUC and the district court. The ISPs, as business subscribers to Time Warner services, are indeed end users under the agreements. The PUC classified "a call between two end users in the same local calling area" as "Local Traffic" and concluded that the interconnection agreements unambiguously include ISP traffic within the definition of "Local Traffic." The PUC ruled that, "[w]hen a transmission path is established between two subscribers in the same mandatory calling area, traffic carried on that path is local traffic, with the telecommunications service component of the call terminating at the ISP location." The district court noted that "as end users, ISPs may receive *local calls* that *terminate* within the local exchange network." (emphasis in original). The court concluded that a modem call to an ISP terminates at the ISP's facility within the local exchange network, basing its conclusion in part on the FCC's treatment of ISPs as end users lying within the local exchange. The FCC treats ISPs as "end users" for pricing purposes, permitting them to purchase telephone service at local business rates rather than interstate access tariffs. Reciprocal Compensation Ruling ¶¶ 5, 17, 23. We conclude that the PUC's consideration of the end-user status of an ISP is appropriate in light of the contractual provision mentioning "termination *to [an] end user[]*."

15

Both of the instant interconnection agreements provide that undefined terms—such as "terminate"—are to be "construed in accordance with their end user usage in the telecommunications industry as of the effective date of [these] Agreement[s]." This provision, which is common to both agreements, tracks well-established rules of contract interpretation. *See KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex. App.-Houston 1987), <u>writ</u> <u>denied</u>. "Beyond the four corners of the parties' agreement, their intent may be evidenced from the surrounding facts and circumstances when the contract was entered. The court may consider. . . ordinary terms, customs and usages then in effect. . . ." *Intratex Gas,* 886 at 278. The parties obviously agreed that "terminate" would mean whatever the telecommunications industry took it to mean at the time they signed the agreements, i.e., in 1996 and 1997.

A 1996 FCC Report defined "termination," for purposes of section 251(b)(5), as "the switching of traffic that is subject to section 251(b)(5) at the terminating carrier's end office switch (or equivalent facility) and delivery of that traffic from that switch to the called party's premises."[17] Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, 11 F.C.C.R. 15,499 ¶ 1040 (1996), *aff'd in part, vacated in part on other grounds*, *Iowa Utils. Bd.*, 120 F.3d 753. As for the modem calls here at issue, the ISPs are Time Warner's customers, making Time Warner the terminating carrier. So, under the foregoing definition, "termination" occurs when Time Warner switches the call at its facility and delivers the call to "the called party's premises," which is the ISP's local facility. Under this usage, the call indeed "terminates" at the ISP's premises.

Both the FCC and Southwestern Bell have heretofore embraced a custom of treating calls to ISPs as though they were local, terminating within the same local exchange network. The FCC recognized that agreements negotiated prior to the Reciprocal Compensation Ruling, as were the ones

---

[17]More recently, in discussing where a modem call "terminates," the FCC has remarked, "An Internet communication does not necessarily have a point of 'termination' in the traditional sense." Reciprocal Compensation Ruling ¶ 18. But the FCC's view at the time of these agreements was clear, as discussed next.

at issue here, had been negotiated in the "context of this Commission's longstanding policy of treating this traffic as local." Reciprocal Compensation Ruling ¶ 24.[18] In fact, the FCC noted that its historic "policy of treating ISP-bound traffic as local for purposes of interstate access charges would, if applied in the separate context of reciprocal compensation, *suggest that [reciprocal] compensation is due for that traffic*." *Id.* ¶ 25 (emphasis added).

We are convinced that the PUC considered ample evidence that both the telecommunications industry as a whole and the parties to this dispute in particular treated ISP-bound calls as terminating locally at the time the interconnection agreements were being negotiated. By the end of 1996, five State commissions had already ruled that modem calls to ISPs are subject to reciprocal compensation. For years, Southwestern Bell had recorded calls made to ISPs as "local" in internal reports and bookkeeping records. Southwestern Bell did not change this practice until 1998, well after entering the instant interconnection agreements. An internal Southwestern Bell memorandum acknowledged that, under then-current FCC rulings, it expected to pay reciprocal compensation for modem calls: "As long as the 'ESP' exemption[19] remains in tact we can anticipate . . . that we will compensate other [LECs] for traffic they terminate to internet access providers." And for some time Southwestern Bell has run an ISP of its own, despite the fact that as an incumbent LEC it is forbidden to offer long-distance/interstate service. It has justified its running of an ISP to the FCC by arguing that ISPs provide local, not interstate, service.

Southwestern Bell makes much over the fact that the PUC and the district court divided Internet traffic into two "components," one local and one interstate, to determine where the call "terminates." Despite its recent Reciprocal Compensation Ruling that Internet traffic is a continuous transmission for jurisdictional purposes—not terminating at the ISP's local server—the FCC

---

[18]The FCC also acknowledged that it had historically "directed states to treat ISP traffic as if it were local." *Id.* ¶ 21.

[19]The FCC has exempted Enhanced Service Providers, a category which includes ISPs, from payment of interstate access charges.

recognized that, for purposes other than jurisdiction,[20] such calls can be treated in the same manner as local traffic. Reciprocal Compensation Ruling ¶ 12, 24. Perceiving such calls as terminating locally for compensation purposes is clearly condoned by the FCC.

We note finally that the FCC listed several factors that state commissions may consider in deciding whether an interconnection agreement should be construed to classify calls to ISPs as local for purposes of reciprocal compensation. *Id.* ¶ 24. The PUC has already considered most of the factors. Moreover, the FCC declared that "state commissions, not this Commission, are the arbiters of what factors are relevant in ascertaining the parties' intentions." *Id.* at ¶ 24.

The district court held that the PUC did not act arbitrarily and capriciously because a reasonable interpretation of the interconnection agreements is that the parties were to treat calls to ISPs like calls to other end users. We agree. The conclusion that modem calls terminate locally for purposes of compensation is both well-reasoned and supported by substantial evidence. We therefore affirm the PUC's decision to include ISP-bound traffic within the reciprocal compensation provisions of the subject interconnection agreements.

Undaunted, Southwestern Bell goes on to contend on appeal that there was no meeting of the minds with regard to the issue of reciprocal compensation for local calls made to ISPs. A review of the record reveals that Southwestern Bell did not raise this issue during the administrative hearing so as to preserve it for judicial review.[21] The failure to raise an issue at the administrative level waives

---

[20]We are cognizant of the fact that the PUC used its two-component theory as the basis both for determining jurisdiction as well as for determining reciprocal compensation. To view the call as two components for jurisdictional purposes runs counter to the FCC's Reciprocal Compensation Ruling as discussed above. Nevertheless, we have today held for different reasons that the PUC properly exercised its jurisdiction in spite of any interstate aspect of the telecommunications. In this part of our opinion, we are addressing only the compensation aspect of the PUC's analysis.

[21]Southwestern Bell points for support to a few sentences in the PUC arbitrator's initial opinion in which the arbitrator questioned whether there had been a meeting of the minds between the parties with respect to the issue of reciprocal compensation. The record reveals, however, that the language in the arbitrator's opinion was mere dicta, and that the arbitrator was not addressing any arguments actually raised by the parties. The Act limits the issues that may be decided in arbitration to those set forth by the parties. 47 U.S.C. § 252(b)(4)(A). Southwestern Bell's argument that it has preserved the issue is unconvincing.

the right to appellate review of that issue. *See Institute for Tech. Dev. v. Brown*, 63 F.3d 445, 449 n. 3 (5th Cir. 1995). Except to the extent that we have already discussed the parties intentions, we will not review separately the meeting-of-the-minds argument that was waived by Southwestern Bell.

## III.

## CONCLUSION

For the foregoing reasons, we hold that the PUC had jurisdiction to determine the issues discussed above, and that the district court had jurisdiction under the Act to hear the matters presented to it. On the merits, we affirm the district court's order denying Southwestern Bell's request for declaratory and injunctive relief. And, like the district court before us, we affirm the PUC's order requiring Southwestern Bell to comply with reciprocal compensation provisions in the instant interconnection agreements with respect to termination of calls to ISPs.

AFFIRMED.