**BELLSOUTH TELECOMMUNICATIONS, INC.,** Plaintiff,

v.

**CINERGY COMMUNICATIONS COMPANY, et al.,** Defendants.

No. CIV.A.03–23–JMH.

United States District Court, E.D. Kentucky.

Dec. 29, 2003.

Dorothy J. Chambers, Louisville, KY, Mark R. Overstreet, Stites & Harbison, Frankfort, KY, Sean A. Lev, Kellogg, Huber, Hanse, Todd & Evans, P.L.L.C., Washington, DC, for Plaintiff.

C. Hatfield, Middleton & Reutlinger, Louisville, KY, Robert Bye, Overland Park, KS, Amy E. Dougherty, Deborah Tully Eversole, Public Service Commission of Kentucky, Frankfort, KY, for Defendants.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

In this action, BellSouth Telecommunications, Inc. ("BellSouth") seeks review of a Kentucky Public Service Commission ("PSC" or "Commission") decision. The decision at issue was the result of an arbitration conducted by the Commission pursuant to Sections 251 and 252 of the Telecommunications Act of 1996, 47 U.S.C. §§ 251–252 (the "1996 Act"). The crux of the decision to which BellSouth objects states that:

> BellSouth may not refuse to provide Digital Subscriber Line ("DSL") service pursuant to a request from an Internet service provider who serves, or who wishes to serve, a customer who has chosen to receive voice service from a Competitive Local Exchange Carrier ("CLEC") that provides service over the Unbundled Network Elements Platform ("UNE–P").

*Petition of Cinergy Communications Company for Arbitration of an Interconnection Agreement with BellSouth Telecommunications, Inc. Pursuant to 47 U.S.C. Section 252;* Case 2001–00432, October 15, 2002 Order. BellSouth asserts that the Commission's decision purports to regulate interstate telecommunications services in a manner that is directly contrary to binding Federal Communications

Commission ("FCC") rulings and to Bell-South's federal tariff. BellSouth also claims that the Commission should never have decided the issue presented in this case because it was not set forth in Cinergy's arbitration petition as required by the 1996 Act. Additionally, BellSouth argues that the PSC's decision was arbitrary and unsupported by the record.

## I. BACKGROUND

### A. Procedural Background

Cinergy is a privately-owned, Kentucky corporation which has been operating in Kentucky as a telecommunications provider since 1977. To facilitate its service to Kentucky residents, Cinergy entered into an initial interconnection agreement with BellSouth which expired on November 29, 2001. On May 30, 2001, Cinergy commenced negotiations with BellSouth for a new interconnection agreement pursuant to Section 251 of the 1996 Act. Despite a number of negotiation sessions over the next several months, the parties were unable to reach agreement on a number of issues. As a result, on December 10, 2001, Cinergy filed a Petition for Arbitration pursuant to Section 252 of the 1996 Act, requesting the PSC resolve sixteen disputed issues.

BellSouth filed its formal Response to the Petition on January 3, 2002, admitting the Commission had jurisdiction over the issues raised by Cinergy. The Commission set a procedural schedule for resolution of the case. Pursuant to the schedule, the parties filed agreed-upon portions of the interconnection agreement, as well as "Best and Final Offers" on the disputed issues. On January 31, 2002, the Commission Staff sponsored an informal confer-ence at which the remaining issues were discussed and debated, including the precise issue BellSouth claims was not properly part of the proceeding. Limited discovery occurred, followed by the filing of direct, and some rebuttal testimony by the parties.

As a result of continued settlement negotiations, only four issues were ultimately submitted to, and decided by, the Commission. The Commission heard the case in a formal hearing on May 22, 2002, which lasted a full day. The parties filed post-hearing briefs, proposed findings of fact and conclusions of law, and an additional brief on a specific issue requested by the Commission. The Commission issued its decision on July 12, 2002.[1]

Both parties sought clarification or rehearing of the Commission's Order. On October 15, 2002, the Commission clarified its Order, and issued a further Order on February 28, 2003, necessitated by the parties' inability to agree on the language for the interconnection agreement which would effectuate the Commission's decisions. On March 20, 2003, the parties submitted the interconnection agreement to the Commission, containing language specified by the Commission, on the disputed provisions. The Commission approved the interconnection agreement on April 21, 2003.

BellSouth commenced the present appeal by filing its complaint on May 9, 2003. Timely answers and briefs were filed. BellSouth challenges only the Commission's decision that BellSouth may not refuse to provide DSL capabilities to customers for whom a CLEC, such as Cinergy, is

---

1. PSC Chairman Huelsmann dissented on the issue of BellSouth's refusal to provide Broadband services to a customer of a CLEC who is providing voice services via UNE–P citing regulatory uncertainty, inconsistency with FCC rulings, and lack of harm to Cinergy as the main reasons for his dissent.

the voice provider through means of the UNE–P.

## B. The Telecommunications Act of 1996

The 1996 Act places certain obligations on incumbent local exchange carriers ("ILECs") such as BellSouth—the companies that have traditionally offered local telephone service in particular areas. These obligations are intended to assist new local telecommunications providers such as Cinergy, AT & T, and MCI; these new local competitors are often referred to as competitive local exchange carriers or "CLECs."

ILECs like BellSouth must, among other things, lease to their competitors "for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis." See 47 U.S.C. § 251(c)(3).[2] In addition to requiring access to UNEs, the 1996 Act requires ILECs such as BellSouth to offer their complete, finished retail telecommunications services provided to end users, to new entrants for resale. See 47 U.S.C. § 251(c)(4).

The 1996 Act contains a specific scheme for implementing the new obligations imposed by the federal statute. This scheme contains three parts. *First,* Congress intended the mandates of Section 251 to be implemented in the first instance through the negotiation of private, consensual agreements between ILECs and CLECs.

Thus, Section 251 imposes on both ILECs and CLECs "[t]he duty to negotiate in good faith in accordance with Section 252 of this title the particular terms and conditions of agreements to fulfill" the specific duties imposed on incumbents by Section 251. *Second,* as a backstop to reliance on privately negotiated agreements, Congress enlisted the aid of state public utility commissions like the PSC. If the parties are unable to agree on all issues within 135 days after the competitor's initial request for negotiation, either party may petition the state commission to arbitrate any "open issues." 47 U.S.C. § 252(b)(1). Regardless of whether the parties reach agreement through voluntary negotiation, mediation, or arbitration, the private parties must submit their agreement to the relevant state commission for approval. *See id.* § 252(e)(1). *Third,* and lastly, state commission decisions under this statute are subject to review in federal district courts for conformity with the terms of the Act. *See id.* § 252(e)(6).

## C. Factual Background

Until recently, customers wishing to access the Internet relied chiefly upon "dial-up" services that relied on the voice channel of a basic telephone line to transmit and receive data at relatively low speeds. Over the last several years, however, BellSouth and other companies have invested billions of dollars to make "broadband" internet access available—that is, to provide access at much higher speeds.[3]

---

**2.** These "network elements" are piece parts of the local telecommunications network.

**3.** In an earlier case in front of the PSC, *Review of BellSouth Telecommunications, Inc.'s Price Regulation Plan,* KPSC Case 99–434. Order, Aug. 3, 2000, the Commission conducted a review of BellSouth's rates, earnings, and method of regulation. Finding that the Company had excess earnings, BellSouth faced the prospect that the Commission

would require it to substantially reduce the rates of its retail ratepayers by millions of dollars. BellSouth proposed to keep the excess earnings in order to build a broadband network into rural markets in Kentucky where standard business case analysis would not support such an investment. BellSouth stated that it would "make these same capabilities available to its competitors on a wholesale basis and therefore, would not have any competitive advantage." *Cinergy Hearing*

There are several competing technologies that provide such high-speed broadband transmission for Internet access. For instance, one of the leading technologies is cable modem service offered over cable television facilities—not telephone linesby companies such as AOL Time Warner. BellSouth offers a competing high-speed transmission service that does use telephone lines. This service is known as DSL. DSL makes use of the portion of the spectrum on a basic copper telephone line (also known as a "local loop") that is not used for voice services. DSL thus enables customers to download information from the Internet at high speeds without interfering with the normal operation of the voice channel on the telephone line.

By itself, DSL service is simply a high-speed data transmission (or transport) service. One can conceptualize DSL as the offering of a particularly large pipe for the transmission of data. In order to provide broadband Internet access on a retail basis, one must combine that DSL transmission service (the pipe) with the information routing and processing capabilities (the water running through the pipe) offered by an Internet Service Provider or "ISP" such as America Online or Earthlink.

BellSouth combines those two functions in its retail high-speed Internet access service, known as FastAccess. In addition to that retail service, BellSouth offers wholesale DSL transmission to independent ISPs so those companies can combine DSL transmission with their own capabilities in order to provide finished broadband Internet access to retail customers. The PSC's decision in this case relates only to Bell-South's wholesale offering of DSL transmission.

The PSC ruled that BellSouth may not refuse to provide DSL service pursuant to a request from an Internet service provider who serves, or wishes to serve, a customer who has chosen to receive voice service from a CLEC that provides service over the UNE–P. In other words, the PSC determined that BellSouth may not refuse to provide DSL to Cinergy, AT & T, and MCI customers; a Kentucky customer must be able to obtain DSL service regardless of the voice carrier he chooses.

## II. STANDARD OF REVIEW

Along with the majority of other circuits, the Sixth Circuit has adopted and utilized a two-tiered review procedure when reviewing a ruling of a state administrative body. This bifurcated standard is employed because arriving at a decision in these types of disputes involves an understanding of the interplay between federal and state law.

■ The federal judiciary first reviews *de novo* whether a state public service commission's orders comply with the requirements of the Telecommunications Act. The Court also reviews the Commission's interpretation of the Act de novo, according little deference to the Commission's interpretation. *Michigan Bell Tel. Co. v. Strand* 305 F.3d 580, 586 (6th Cir. 2002). If no illegality is uncovered during such a review, the question of whether the state commission's decision is correct must then be analyzed, but under the more deferential arbitrary-and-capricious standard of review usually accorded state administrative bodies' assessments of state law principles. *See Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.,* 339 F.3d 428, 433 (6th Cir.2003); *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Texas,* 208 F.3d 475, 482 (5th Cir.2000); *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999); *U.S. West Communica-*

*Exhibit 1 (Cinergy App. 3).* The Commission accepted BellSouth's proposal.

*tions v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir.1999).

The arbitrary and capricious standard is the most deferential standard of judicial review of agency action, upholding those outcomes supported by a reasoned explanation, based upon the evidence in the record as a whole. *See Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir.1998). The Court will uphold decision "if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Id.* Thus, absent clear error in interpretation of federal law or unsupported, arbitrary and capricious findings by a state commission, the decisions of state commissions generally stand. *Michigan Bell Tel. Co. v. MCIMetro Access Trans. Svcs. Inc.*, 323 F.3d 348, 353 (6th Cir.2003) (citing *Michigan Bell Tel. Co.*, 305 F.3d at 586–87).

## III. ANALYSIS

### A. Whether the PSC violated Section 252(b) of the Act

█ Section 252(b)(4)(A) of the 1996 Act states that a "State commission shall limit its consideration of any petition . . . to the issues set forth in the petition and in the response, if any." 47 U.S.C. § 252(b)(4)(A). Cinergy filed a petition with the PSC that set forth fifteen unresolved issues arising out of interconnection negotiations with BellSouth. As stated above, due to continued negotiations, only four of these issues were ultimately addressed by the Commission.

BellSouth contends that one of the issues ultimately decided by the Commission, BellSouth's alleged obligation to continue to provide DSL service over CLEC UNE–P lines, was not raised in Cinergy's

petition for arbitration. BellSouth relies on the plain language of Section 252(b)(4)(A) and states that it is improper for state commissions to resolve issues not presented in a petition for arbitration under the 1996 Act. Issues related to issues actually raised in a petition are, in BellSouth's opinion, not to be arbitrated by the PSC because of lack of notice to the parties. In any event, BellSouth contends, the issue ultimately decided by the PSC is in no way related to the issue set forth in Cinergy's original petition. Therefore, BellSouth argues that the PSC's ruling requiring BellSouth to provide DSL service on a UNE–P line was inappropriate and in violation of Section 252(b).

Cinergy takes the position that the Act does not require precise pleadings and, once an issue is open, the PSC has the discretion to review related issues. Relying on *TCG Milwaukee, Inc. v. Public Service Com'n of Wisconsin*, 980 F.Supp. 992 (W.D.Wis.1997), Cinergy states that once the parties create an open issue, the PSC has considerable latitude to resolve the related issues necessary to finalize the interconnection agreement and make it a working document. Cinergy also contends that BellSouth had sufficient notice that this was an issue before the Commission. The issue of DSL over UNE–P was debated by the parties at the informal conference, again at the hearing, and once again in the briefs, all without objection from BellSouth.

The PSC determined in its October 15, 2003, Order that the DSL issue was "directly related" to the line-splitting issue that Cinergy raised as Issue No. 7 in its original petition, and that both parties had addressed this issue at later points in the proceeding.[4] Therefore, the PSC deter-

---

4. The Commission also stated that determinations such as the one at issue reflect the policy of the PSC. The Commission cited Administrative Case No. 382, An Inquiry Into the

mined that the issue of DSL over the UNE–P was properly before the Commission. We agree and find no violation of Section 252(b).

### B. Whether the PSC's Order is Preempted

■ BellSouth argues that PSC's Order must fail because of federal preemption, stating that, "as a matter of federal law, the Federal Communications Commission ('FCC')—not state commissions—has exclusive jurisdiction over interstate communications." Cinergy counters that this is an oversimplification that results in a flawed characterization of the current law.

BellSouth maintains that DSL service, as used to provide Internet access, is an interstate service subject to the FCC's jurisdiction. Cinergy, on the other hand, states that since 1996, responsibility for increasing competition in the realm of telecommunications services, including those with an interstate dimension, has become the responsibility of both federal and state legislatures. Cinergy points to the concept of "cooperative federalism," and states that the Sixth Circuit has described this concept as "harmoniz[ing]" the efforts of federal and state agencies. *Michigan Bell Telephone Company v. MCIMetro Access Transmission Services, Inc.*, 323 F.3d 348, 352 (6th Cir.2003).

The Supreme Court has recognized that the Act cannot divide the world of domestic telephone service "neatly into two hemispheres," one consisting of interstate service, over which the FCC has plenary authority, and the other consisting of in-

trastate service, over which the states retain exclusive jurisdiction. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); see also *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Texas*, 208 F.3d 475, 480 (5th Cir.2000). Rather, observed the Court, "the realities of technology and economics belie such a clean parceling of responsibility." *Id.* The FCC has also rejected the argument advanced by Bell-South, noting that "state commission authority over interconnection agreements pursuant to Section 252 extends to both interstate and intrastate matters." Reciprocal Compensation Ruling ¶ 25, quoting *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order*, 11 F.C.C.R. 15499 ¶ 84, 1996 WL 452885 (1996).

In its Order, the PSC concluded that it did in fact have jurisdiction over this issue and that the FCC determinations were not preemptive:

> We also have jurisdiction over the issue of whether BellSouth acts reasonably in refusing to provide DSL service to CLEC UNE–P customers under, inter alia, 47 U.S.C. § 252(e) and K.R.S. 278.280. The FCC's determination on this issue is not, and does not purport to be, preemptive.

July 12, Order at 2.

■ State laws can be expressly or impliedly preempted by federal law. *Michigan Bell Tel. Co.*, 323 F.3d at 358. Federal law may preempt state law when federal statutory provisions or objectives

---

Development of Deaveraged Rates for Unbundled Network Elements, Order dated December 18, 2001 at 36 which states, "The Commission also makes clear in this Order that ordinarily combined UNEs must also be made available where line-splitting occurs. Line-splitting must be made available to all CLECs

on a nondiscriminatory basis. Moreover, BellSouth may not discontinue the provision of line-splitting when a CLEC provides voice service through UNE–P, regardless of which xDSL provider is used." BellSouth did not contest this Commission ruling.

would be frustrated by the application of state law. *Id.* Moreover, where Congress intends for federal law to govern an entire field, federal law preempts all state law in that field. *Id.* The Sixth Circuit has held that when a state law is not expressly preempted, courts must begin with the presumption that the law is valid. *Springston v. Consolidated Rail Corp.*, 130 F.3d 241, 244 (6th Cir.1997). " 'It will not be presumed that a federal statute was intended to supersede the exercise of power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly presumed.' " *Id.* (quoting *New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973)).

When Congress enacted the Telecommunications Act of 1996, it did not expressly preempt state regulation of interconnection. *Michigan Bell*, 323 F.3d at 358. In fact, it expressly preserved existing state laws that furthered Congress's goals and authorized states to implement additional requirements that would foster local interconnection and competition. *Id.* Specifically, Section 251(d)(3) of the Act states that the Federal Communications Commission shall not preclude enforcement of state regulations that establish interconnection and are consistent with the Act. 47 U.S.C. § 251(d)(3).

The Act permits a great deal of state commission involvement in the new regime it sets up for the operation of local telecommunications markets, "as long as state commission regulations are consistent with the Act." *Michigan Bell Tel. Co.*, 323 F.3d at 359 (citing *Verizon North, Inc., v. Strand*, 309 F.3d 935 (6th Cir.2002)). "Congress has made clear that the States are not ousted from playing a role in the development of competitive telecommunications markets . . . however, Congress did not intend to permit state regulations that

conflicted with the 1996 Act . . . Thus, a state may not impose any requirement that is contrary to terms of sections 251 though 261 or that 'stands as an obstacle to the accomplishment and execution of the full objectives of Congress.' " *Michigan Bell Tel. Co.*, 323 F.3d at 359 (quoting *In re Public Utility Commission of Texas*, 13 F.C.C.R. 3460, ¶ 52, 1997 WL 603179 (Oct. 1, 1997)) (internal citations omitted). According to the FCC, as long as state regulations do not prevent a carrier from taking advantage of sections 251 and 252 of the Act, state regulations are not preempted. *Id.* (citing *In re Public Utility Commission of Texas*, 13 F.C.C.R. 3460, ¶ 50–52). The Court finds that nothing in the state regulations stand as an obstacle to the accomplishment and execution of the full objectives of Congress.

The 1996 Act incorporated the concept of "cooperative federalism," whereby federal and state agencies "harmonize" their efforts and federal courts oversee this "partnership." *Michigan Bell*, 323 F.3d at 352. Quite clearly, the 1996 Act makes room for state regulations, orders and requirements of state commissions as long as they do not "substantially prevent" implementation of federal statutory requirements. The PSC's order, challenged here by BellSouth, embodies just such a requirement. 47 U.S.C. § 251(d)(3)(C). It establishes a relatively modest interconnection-related condition for a local exchange carrier so as to ameliorate a chilling effect on competition for local telecommunications regulated by the Commission. The PSC order does not substantially prevent implementation of federal statutory requirements and thus, it is the Court's determination that there is no federal preemption.

**C.  Whether the PSC's decision is arbitrary and capricious.**

██ Aside from BellSouth's other arguments, the company alleges that the PSC's

decision is arbitrary and capricious in that it is unsupported by substantial evidence in the record as a whole. BellSouth contends that the Commission lacked any support for its conclusion that BellSouth's policy of refusing to provide DSL service on CLEC UNE–P lines has a "chilling effect on competition."

The Kentucky PSC determined that it would consider "whether BellSouth acts reasonably in refusing to provide DSL service to competitive carrier UNE–P customers under, inter alia, 47 U.S.C. § 252(e) [which preserves state law] and KRS § 278.280." July, 12, 2002 Order at 2. Kentucky law provides:

> Whenever the commission...finds that the rules, regulations, practices, equipment, appliances, facilities or service of any utility subject to its jurisdiction...are unjust [or] unreasonable,...the commission shall determine the just [or] reasonable...practices,...service or methods to be observed,...and shall fix the same by its order, rule or regulation.

KRS § 278.280(1). The PSC determined that BellSouth violated the above statute because its "practice of tying its DSL service to its own voice service to increase its already considerable market power in the voice market has a chilling effect on competition and limits the prerogative of Kentucky customers to choose their own telecommunications carriers." July 12, 2002 Order at 7.

By claiming that the PSC's findings lack any support in the record, BellSouth vastly understates the administrative record. Cinergy offered voluminous testimony describing BellSouth's anti-competitive practices and explaining how they would cripple Cinergy's ability to compete in the local voice market. For instance, prior to this arbitration, the PSC entered an advisory opinion stemming from a separate investigation of BellSouth's policies and found such policies to have a chilling effect on competition:

> BellSouth is aggressively offering customers bundled voice and advanced services while, according to AT & T, BellSouth consistently precludes CLECs who use the unbundled network element platform (UNE–P) from offering customers this same option. This has the effect of chilling local competition for advanced services.

*Kentucky 271 Advisory Opinion,* pp. 13–14. Cinergy also presented multiple witness to testify regarding BellSouth's policy's effect on competition.

The PSC's decision is supported by a reasoned explanation and is based upon the evidence in the record as a whole. Consequently, the Court sees nothing that points to the PSC's decision being arbitrary or capricious. Therefore, because the PSC's decision seems to be the result of a deliberate principled reasoning process, and is supported by substantial evidence, the Court finds that the decision of the state commission should stand.

Accordingly,

**IT IS ORDERED**, that the PSC's decision be, and the same hereby is, **AFFIRMED**.