JERRY E. SMITH, Circuit Judge,
dissenting:
I respectfully dissent and would affirm the dismissal. The district court correctly opined that defendants are immune under the Eleventh Amendment.
When a state commission elects to arbitrate an interconnection agreement or approve a Statement of Generally Available Terms (“SGAT”), the Telecommunications Act of 1996 (the “1996 Act” or the “Act”) vests jurisdiction in the federal courts for any aggrieved party to challenge state actions inconsistent with the requirements of the Act.[1] That jurisdiction is exclusive.[2] Pursuant to the Eleventh Amendment, however, federal courts may not entertain suits by citizens against states arising out of congressional legislation, such as the 1996 Act, enacted under the Commerce Clause.[3]
Under the Eleventh Amendment, states enjoy broad sovereign immunity from suit in federal court:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
U.S. Const, amend. XI. Though the amendment’s text most reasonably applies only to suits in diversity, the Supreme *650 Court has consistently looked to the principle underlying the amendment to bar suits on federal causes of action as well.[4] Thus, individuals may not sue states in federal court on causes of action arising out of Article I legislation such as the 1996 Act.[5]
This immunity extends not only to states but to their agencies, as well.[6] The Eleventh Amendment thus immunizes the Louisiana Commission from -suit in federal court. Under certain, limited circumstances, however, state officials — like the commissioners — may be subjected to suit, notwithstanding the Eleventh Amendment, under Ex parte Young, 209 U.S. 123, 158-59, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
Whether the 1996 Act violates the Eleventh Amendment is res nova in this Circuit.[7] On appeal, the telephone carriers present three unconvincing theories to avoid sovereign immunity.
First, the carriers assert the application of the doctrine announced in Young to allow suit against the commissioners. Second, they assert that the commission effectively waived its state sovereign immunity by electing to arbitrate the interconnection agreement and approve Bell-South’s SCAT under powers granted by the 1996 Act. Third, AT&T claims that the Act contemplates only appellate-style judicial review and thus does not fall within the Eleventh Amendment’s prohibition of “suit[s] in law or equity.”[8]
The Supreme Court recently addressed the Young and waiver issues in, respectively, Seminole Tribe and College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), recognizing a broad Eleventh Amendment immunity sufficiently capacious to bar suit here under the 1996 Act. In seeking reversal, the telephone carriers urge, and the majority adopts, an unduly narrow interpretation of those rulings. They would look to the facts, circumstances, and rationales of each holding as somehow exhaustive of the proper scope of the Eleventh Amendment jurisdictional bar, rather than merely illustrative of the immunity states enjoy from suit in federal court.
I.
In Seminole Tribe, the Court breathed new life into Eleventh Amendment immunity. That holding not only expanded the scope of the amendment to cover all federal causes of action arising out Congress’s Article I powers[9] — thereby barring suit *651 under the 1996 Act against a State commission — but also narrowed the fictional exception to state sovereign immunity first established in Young — thereby barring suit under the Act against state commissioners as well.[10] The majority therefore errs in accepting the telephone carriers’ argument that AT&T’s suit should be permitted to proceed against the member' commissioners under Young.
In Young, the Court fashioned a. judicial remedy to provide prospective relief against state officials to redress ongoing violations of federal law, as a special exception to the Eleventh Amendment bar to suit. Under Seminole Tribe, however, judicial relief pursuant to Young is not available to redress violations of the 1996 Act, because the Act provides a limited statutory remedial scheme that supplants the relief otherwise alternatively available under Young.
A.
It is not enough that the Eleventh Amendment permits judicial application of Young to the 1996 Act. Under Seminole Tribe, courts additionally must determine whether, in enacting that bill, Congress acted to supplant that judicial remedy by substituting a statute-based remedial scheme. See Seminole Tribe, 517 U.S. at 74-76, 116 S.Ct. 1114.
1.
As a judicially-crafted exception to the Eleventh Amendment, the Young doctrine is not a fiction in which courts ought to engage lightly.[11] It was created in Young to give relief against state officials to vindicate constitutional rights.[12] Young since has been extended to vindicate federal statutory rights.[13]
Nevertheless, it is Congress that creates federal statutory rights, so it is also Congress that dictates the remedies available to enforce statutory violations.[14] Thus, “where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young.” Seminole Tribe, 517 U.S. at 74, 116 S.Ct. 1114.[15]
*652 The question, then, is whether the judicial review provisions of the 1996 Act establish a “detailed remedial scheme for the enforcement ... of a statutorily created right,” id., sufficient under Seminole Tribe to supplant the judicially-made Young remedy that otherwise would be alternatively available to AT&T. See Seminole Tribe, 517 U.S. at 74, 116 S.Ct. 1114. In other words, we must determine whether AT&T may pursue relief exclusively through the Act or whether, alternatively, Young is also available.
In concluding that an Indian gaming act supplanted Young, the Seminole Tribe Court explained:
Here, Congress intended [the rights conferred by the act] to be enforced against the State in an action brought under [25 U.S.C. § 2710(d)(7)]; the intricate procedures set forth in that provision show that Congress intended therein not only to define, but also to limit significantly, the duty imposed by § 2710(d)(3). For example, where the court finds that the Staté has failed to negotiate in good faith, the only remedy prescribed is an order directing the State and the Indian tribe to conclude a compact within 60 days. And if the parties disregard the court’s order and fail to conclude a compact within the 60-day period, the only sanction is that each party then must submit a proposed compact to a mediator who selects the one which best embodies the terms of the Act. Finally, if the State fails to accept the compact selected by the mediator, the only sanction against it is that the mediator shall notify the Secretary of the Interior who then must prescribe regulations governing class III gaming on the tribal lands at issue. By contrast with this quite modest set of sanctions, an action brought against a state official under Ex parte Young would expose that official to the full remedial powers of a federal court, including, presumably, contempt sanctions. If § 2710(d)(3) could be enforced in a suit under Ex parte Young, § 2710(d)(7) would have been superfluous; it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under Ex paHe Young.
Id. at 74-75, 116 S.Ct. 1114 (footnote omitted).
In other words, to supplant Young, a statute must provide a detailed and limited remedial legislative scheme, narrower in scope than what would be available under Young. Otherwise, to invoke Young would be to render the judicial review provisions of a statute superfluous.
Under the 1996 Act, an aggrieved party may seek judicial review only under certain conditions: “In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251....” 47 U.S.C. § 252(e)(6) (emphasis added). The Act thus limits the timing of access to federal courts, the scope of commission conduct subject to judicial review, and the defendants vulnerable to suit.
First, with respect to access to suit and the scope of reviewable commission conduct, aggrieved parties have a right to judicial relief under the Act, but only after the State commission has made a detemi-nation.[16] This is not unlike the requirement of a final agency action to trigger Administrative Procedure Act judicial review, see 5 U.S.C. §§ 702, 704, and it is *653 available only to review the validity of a commission agreement or statement under the Act and not its process. The 1996 Act thus imposes a number of statutory duties on State commissions that are either not effectively or only partially effectively reviewable under this judicial review provision, including the duty to arbitrate open issues brought to the commission, see 47 U.S.C. § 252(a)(2); the duty to provide an opportunity to respond to the party against whom another party has petitioned for arbitration, see id. § 252(b)(3); the duty to arbitrate only those issues raised by a petition, see id. § 252(b)(4)(A); the duty to conclude the resolution of unresolved issues within nine months of the initial request, see id. § 252(b)(4)(C); and, with respect to SGAT’s, the duty to complete review within sixty days of submission, see id. § 252(f)(3).
To delay judicial review until the state commission actually makes a determination (rather than before), and then to limit that review only to ensuring that any agreement or statement (as opposed to the arbitration process itself) complies with the Act, is to “limit significantly ... the dut[ies] imposed by”[17] the Act and thus to supplant relief under Young. A plaintiff might prefer to seek the immediate injunc-five relief offered by Young to redress ongoing violations of the Act,[18] but the Act requires the aggrieved party to wait for a determination by the state commission before filing suit, even if it means that some violations, such as compliance with the statutory deadlines, might never be redressed. The Act therefore provides a remedial scheme that supplants relief otherwise offered by Young.
Second, the Act refers • only to cases involving “a State commission.” Id. § 252(e)(6). No reference is made to state commissioners. As Seminole Tribe teaches, courts should not lightly construe Congressional intent to “expose [a state] official to the full remedial powers of a federal court, including, presumably, contempt sanctions,” where the statute seems to suggest otherwise by providing alternative remedies. Seminole Tribe, 517 U.S. at 75, 116 S.Ct. 1114.[19] Given that only parties “aggrieved by such determination may bring an action” and that such actions are limited “to determining] whether the agreement or statement” complies with the Act, § 252(e)(6), the most reasonable construction is to limit the scope of judicial review to the only parties able to trigger it — state commissions.[20]
*654 Notwithstanding the availability of in-junctive relief, the judicial review provisions are sufficiently limited to supplant relief under Young. That the limited statutory remedy under the Act against state commissions is actually not available because it is unconstitutional under the Eleventh Amendment does not alter the determination that the Act supplants Young relief against state commissioners. The Supreme Court directly confronted this issue in Seminole Tribe, concluding that the Court could consider the alternative remedy provided by Congress sufficient to supplant relief under Young, notwithstanding the fact that that remedy was unconstitutional. This result struck some commentators as absurd,[21] but the Court unhesitatingly concluded that it is for Congress, and not the courts, to rewrite defective statutes.[22]
2.
The telephone carriers and the majority would apply a narrower reading of Seminole Tribe, however, limiting its scope to the particular federal statute that decision construed. The carriers argue that the 1996 Act does not limit relief nearly as dramatically as does the statute in Seminole Tribe and that Seminole Tribe held only that that enactment was sufficient to supplant Young. After all, the same kind of injunctive relief to redress ongoing violations is available under the 1996 Act as is available under Young; that was not so in Seminole Tribe. All an aggrieved party need do under the 1996 Act is to satisfy the administrative exhaustion-like conditions of the Act’s judicial review provision, as was done here.
But that is precisely the problem under Seminole Tribe. Section 252(e)(6) limits the scope of Commission conduct subject to scrutiny by federal courts and thus supplants Young. Under Seminole Tribe, 517 U.S. at 74, 116 S.Ct. 1114, Young relief is unavailable when, by enacting the statute, “Congress intended therein not only to define, but also to limit significantly, the duty imposed” by the statute through a limited remedial scheme.
This is the carriers’ strongest argument against applying Seminole Tribe, which is silent on the question, because Seminole Tribe does not expressly state that a federal statute limiting defendants and commission duties subject to judicial review, but not remedies such as injunctive relief, is sufficient to supplant Young. Nonetheless, the carriers’ attempt to distinguish between limits on available remedies (as in Seminole Tribe) and limits on defendants *655 and duties (as in the instant case) finds no support in Seminole Tribe, which, after all, describes Young relief as a “narrow exception to the Eleventh Amendment.” Id. at 74, 116 S.Ct. 1114. Therefore, in the face of ambiguity in Seminole Tribe as to whether it precludes Young relief only where a statute prohibits certain judicial remedies, or also where a statute limits only defendants and duties, the majority errs in resolving that ambiguity against state sovereign immunity.
B.
Because the Act confers exclusive jurisdiction in the federal courts,[23] and, as I have shown, an action in federal court is barred under the Eleventh Amendment, no review to enforce the commission’s or a commissioner’s compliance with the Act is available in state or federal court. This circumstance — that there is neither a state nor a federal forum to vindicate federal rights created by the Act — is not alone sufficient to trigger relief under Young. Such a rule was suggested in Idaho v. Coeur d’Alene Tribe, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), as a mere factor to support application of Young, but even that minimal suggestion was endorsed by only two Justices[24] and expressly repudiated by three.[25] The governing rule remains the same: Relief under Young is available where prospective relief is necessary to redress on-going violations of federal law,[26] but only if Congress has not supplanted that relief with an alternative, limited remedial scheme. See Seminole Tribe, 517 U.S. at 74-75, 116 S.Ct. 1114.
II.
It is not enough to say that the Eleventh Amendment applies and that the narrow exception of Young has been supplanted by Congress, for a state might be found to have waived such immunity. There is no actual waiver in this case, and, even if constructive waiver is still available as a matter of law, the state defendants did not waive its immunity voluntarily. They therefore have retained their immunity under the Eleventh Amendment.
A.
As the majority seems to acknowledge, there was no express waiver; Louisiana did not enact a law or otherwise express its consent to suit in federal court under the 1996 Act. Instead, the majority reasons that Louisiana effected “a voluntary gratuity induced waiver” by participating in the regulatory scheme.
In College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), the Court overruled Parden v. Terminal Railway of Alabama State Docks Department, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), and rejected the theory that a state might *656 constructively waive sovereign immunity.[27] In its place, the Court adopted “[t]he classic description of an effective waiver of a constitutional right” — that is, “the intentional relinquishment or abandonment of a known right or privilege.” College Sav. Bank, 527 U.S. at 682, 119 S.Ct. 2219. The test is a “stringent one.” Id. at 675, 119 S.Ct. 2219. In any event, the majority correctly acknowledges that a theory of constructive waiver is no longer viable.
B.
For a waiver to be effective, it must be completely voluntary and not coerced or based on an unconstitutional condition. The majority errs in concluding that the supposed waiver here meets that requirement.
“[Wjhere the constitutionally guaranteed protection of the States’ sovereign immunity is involved, the point of coercion is automatically passed — -and the voluntariness of waiver destroyed — when what is attached to the refusal to waive is the exclusion of the State from otherwise laioful activity.” College Sav. Bank, 527 U.S. at 687, 119 S.Ct. 2219 (emphasis added). The protection of College Savings Bank is not limited only to states that were previously engaging in federally-regulated activity (as distinguished from states that were merely participating in a federal program), as mistakenly urged by the carriers, but instead extends to any otherwise lawful activity. For example, the Court rejected, out of hand, any exception whatsoever for states acting as market participants. Id. at 685-86, 119 S.Ct. 2219.[28]
The 1996 Act does not force states to waive their sovereign immunity, but it unconstitutionally subjects to suit in federal court any state commission that elects to arbitrate interconnection agreements between competitors operating in local telephone service markets within their jurisdiction or to approve SGAT’s of Bell Operating Companies providing service to their jurisdiction. The telephone carriers emphasize that the Act gives clear notice that state commissions choosing to regulate will subject themselves to suit in federal court.[29] After College Savings Bank, however, clear notice, though still necessary, is no longer sufficient to induce waiver of Eleventh Amendment immunity.
Under College Savings Bank, even a clearly-induced waiver is ineffective if arbitration of interconnection agreements or approval of SGAT’s by a state commission constitutes “otherwise lawful activity.” Id. at 687, 119 S.Ct. 2219. The question, therefore, is whether arbitration of interconnection agreements or approval of SGAT’s by a state commission constitutes “otherwise lawful activity” for which Congress cannot condition a waiver of sovereign immunity, or whether, instead, the grant of such power to the states is a gift *657 or gratuity, which Congress may so condition. Id. at 686-87, 119 S.Ct. 2219.
Before the 1996 Act, state commissions regulated local telephone service markets within their jurisdiction. The Act takes that local regulatory power from the states,[30] as the telephone carriers themselves appeal- to concede. Granted, the Act does not keep such authority exclusively in the hands of Congress or the FCC, but allows it back to the state commissions. That delegation back to the states is permitted under the statute, however, only if the states subject themselves to suit in federal court.
Congress was not merely conditioning a gift or a gratuity, as the carriers insist and the majority concludes. Rather, the Act imposes conditions on states wishing to continue to regulate local telephone markets as they once did. This Congress cannot do.
In essence, the Act requires state commissions to sacrifice either policy preference or sovereign immunity. A state commission may wish to intervene and make its policy preferences known, but doing so subjects it to federal jurisdiction. To avoid federal jurisdiction, a state commission must abdicate its regulatory goals and hope that the private parties and the FCC will come to a solution it would endorse. This hardly rises to a voluntary waiver of a state’s constitutional right to sovereign immunity in federal court.
The telephone carriers would re-characterize state commission powers under the Act as “federal regulatory authority,” and thus the kind of activity in which a state may not lawfully engage without congressional authorization. They and the panel majority would analogize the Act to congressional exercises of its powers under the Compact and Spending Clauses, under which Congress is constitutionally authorized under College Savings Bank to require waiver.
The regulatory powers enjoyed by state commissions under the 1996 Act are indeed “federal” in the sense that Congress, and not a particular state, has articulated the governing standards. But the underlying subject matter nevertheless remains within the indisputable (if non-exclusive) domain of the states. Like other matters of commerce, local telephone is a matter both within the jurisdiction of state regulators and subject to federal preemption. As the majority observes, “[T]he question in this case is not whether the Federal Government has taken the regulation of local telecommunications competition away from the states. With regard to the matters addressed by the 1996 Act, it unquestionably has.” Iowa Utils. Bd., 525 U.S. at 379 n. 6, 119 S.Ct. 721.
To be sure, Congress could have preempted state regulation of all telephone.[31] And Congress may give, the states the option of providing their own regulations or facing preemption by federal law.[32] But the greater does not always *658 include the lesser, and it certainly does not when state sovereignty — as opposed to mere policy preference — is at issue.
In pursuit of legitimate ends such as telephone regulation, Congress may not offend state sovereignty. This was so in the commandeering cases[33] and is no less so here with respect to the Eleventh Amendment. Congress may ask states to choose either to regulate or to stand back and let federal law take over. But just as it cannot commandeer states to conduct federal regulation on behalf of the United States, it cannot condition, on submission to suits in federal court, state participation in those regulatory affairs in which states once freely engaged.
Thus, the telephone carriers’ argument that state commissions enjoy the option whether to regulate may solve Tenth Amendment problems raised in Printz or New York but does not address the concern of coerced waiver of state sovereignty under the Eleventh Amendment. Giving states the choice whether to be preempted by federal law represents a permissible form of “cooperative federalism,” Hodel, 452 U.S. at 289, 101 S.Ct. 2352, but the conscription of state officials to execute federal regulatory programs or the subjection of state officers to suit in federal court diminishes the “accountability of state [and] federal officials” and thereby violates constitutional principles of federalism, Printz, 521 U.S. at 929-30, 117 S.Ct. 2365.
III.
The Eleventh Amendment bars AT&T from suing the state defendants but not from suing BellSouth. AT&T thus argues that the district court abused its discretion when it dismissed the entire case, even as to BellSouth.[34]
Authority to dismiss an entire case because of the unavailability of one particular party is governed by Fbd.R.Civ.P. 19, which “requires that if, as a matter of equity the court finds that the lawsuit cannot proceed without the absent party, then that party be considered indispensable and the case dismissed.” Shelton, 843 F.2d at 216 (emphasis added) We review the district court’s exercise of its equitable powers for abuse of discretion. See In re Nikoloutsos, 199 F.3d at 236.
To determine whether a party is indispensable, courts look to rule 19(b), which states:
[T]he court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person’s absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures', the prejudice can be lessened or avoided; third, whether a judgment rendered in the person’s absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
The determination of whether a party is “indispensable” is thus a pragmatic one.[35] *659 “The distilled essence” of the four factors “is the attempt to balance the rights of all concerned.” Schutten, 421 F.2d at 873. In other words,
[t]he plaintiff has the right to “control” his own litigation and to choose his own forum. This “right” is, however, like all other rights, “defined” by the rights of others. Thus the defendant has the right to be safe from needless multiple litigation and from incurring avoidable inconsistent obligations. Likewise the interests of the outsider who cannot be joined must be considered. Finally there is the public interest and the interest the court has in seeing that insofar as possible the litigation will be both effective and expeditious.

Id.

The district court did not abuse its equitable powers, under rule 19, to dismiss the entire case. It fairly reasoned that it “lacks the power [under Seminole Tribe] to create a remedy under the 1996 Act. The congressional choice of remedy must be respected. Therefore, the plaintiffs can no longer obtain the relief that they requested in their complaints against the Public Service Commission.” AT&T Communications, 43 F.Supp.2d at 604.
Imagine if it were otherwise: The 1996 Act cannot constitutionally subject state commissions to suit. For a federal court then to rule on the validity of an agreement — only as against the other carrier, and not against the state defendants as well — is potentially to expose the carriers to conflicting orders. AT&T’s suggestion that the Act allows the FCC to take over regulatory authority from the state commission “[i]f a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section,” § 252(e)(5), is of little help, for the very problem at hand is not the commission’s failure to act, but the validity of those acts under federal law, and the Act permits FCC jurisdiction only in cases of the former.
Thus, in rejecting the argument that, under § 252(e)(6), the other party to the agreement (here, BellSouth) was the “only proper part[y] for suit,” one court opined:
It is the [Commission’s] duty, if it chooses to regulate, not the other party’s, to ensure that the agreement meets the requirements of the Act.... Furthermore, it is the [Commission’s] function, not the other party’s, to enforce the agreement. Lacking power to enjoin the [Commission] from enforcing the approved agreement, federal courts would have little effective remedy for aggrieved plaintiffs, or would subject companies to the intolerable prospect of conflicting commands from federal courts and state regulatory agencies.
Michigan Bell Tel. Co. v. Climax Tel. Co., 202 F.3d 862, 868 (6th Cir.) (emphasis added), cert. denied, — U.S. -, 121 S.Ct. 54, 148 L.Ed.2d 22 (2000).
To allow suit here against BellSouth potentially either would expose the carriers to conflicting commands or would prejudice the state defendants by putting their policy preferences at risk of reversal notwithstanding their immunity under the Eleventh Amendment from interference by federal courts. Thus, AT&T’s argument that rule 19(b) ought not bar suit against BellSouth because no adequate remedy is otherwise available directly confronts another rule 19(b) factor — that is, that any adequate remedy inevitably and simultaneously would prejudice the Louisiana Commission’s immunity from interference of the federal courts.
Finally, AT&T complains that “an equitable doctrine cannot be invoked to defeat the statutory mandate that aggrieved parties have the right of review of the legality of commission-approved interconnection agreement [sic] in federal court.” As I have explained, however, the statute is unconstitutional, and it is up to Congress to fix it.
I respectfully dissent.

. "If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.” Id. § 252(e)(4).

. See Seminole Tribe v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

. See id. at 69-70, 116 S.Ct. 1114 (rejecting blind reliance on the text of the Eleventh Amendment because it dealt only with particular problem of diversity jurisdiction created by an incorrect decision in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793)); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (same).

. See, e.g., Hans, 134 U.S. at 18-19, 10 S.Ct. 504; Seminole Tribe, 517 U.S. at 72-73, 116 S.Ct. 1114. Of course, federal legislation enacted pursuant to Section 5 of the Fourteenth Amendment may constitutionally abrogate state sovereign immunity. See Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

. See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

. The majority relies substantially on AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), but the Eleventh Amendment issue was neither presented nor addressed in that case.

. The majorit}' summarily rejects this argument, and I agree.

. See Seminole Tribe, 517 U.S. at 72-73, 116 S.Ct. 1114 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.”). Seminole Tribe specifically involved the Indian Commerce Clause and explicitly overruled Pennsylvania v. Union Gas Co., 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which had addressed the Interstate Commerce Clause, see Seminole Tribe, 517 U.S. at 66, 116 S.Ct. 1114 — provisions both found within Congress's legislative powers enumerated in Article I, Section 8. But a state's sovereign immunity is not restricted to that section, for Hans itself dealt with the Contracts Clause, a constitutional restriction on the states located within Article I, Section 10. See Hans.

. See Seminole Tribe, 517 U.S. at 74, 116 S.Ct. 1114 (stating that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young.”).

. See Seminole Tribe, 517 U.S. at 74-76, 116 S.Ct. 1114 (noting that Young is a "narrow exception to the Eleventh Amendment").

. See Young, 209 U.S. at 159-60, 28 S.Ct. 441 ("The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.”).

. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105-06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (recognizing that the Young remedy is available to address violations of federal but not state law).

. See David P. Currie, Ex Parte Young After Seminole Tribe, 72 N.Y.U. L. Rev. 547, 549 (1997) ("Congress is perfectly free to abolish the remedy recognized by Ex parte Young.”); id. at 551 ("Seminole Tribe will have its most significant effect on actions involving statutory, not constitutional rights.”)

. See also Currie, 72 N.Y.U. L. Rev. at 551 ("Seminole Tribe may well preclude the use of Ex parte Young in additional cases involving statutory rights.”).

. See GTE Southwest, Inc. v. Graves, 989 F.Supp. 1148, 1150 (W.D.Okla.1997); GTE N. Inc. v. Glaze v. 989 F.Supp. 922 (N.D.Ohio 1997); GTE Northwest, Inc. v. Nelson, 969 F.Supp. 654 (D.Wash.1997); GTE Fla., Inc. v. Johnson, 964 F.Supp. 333 (N.D.Fla.1997); GTE S. Inc. v. Breathitt, 963 F.Supp. 610 (E.D.Ky.1997); GTE S. Inc. v. Morrison, 957 F.Supp. 800 (E.D.Va.1997); Contel of Minn., Inc. v. Jacobs, 1997 WL 809628 (D.Minn.1997).

. Seminole Tribe, 517 U.S. at 74, 116 S.Ct. 1114.

. That an on-going violation is the result of a past wrong does not transform the remedy from a prospective to a retrospective one. Relief under Young is still available in these cases. See CSX Transp., Inc. v. Bd. of Pub. Works, 138 F.3d 537, 541 (4th Cir.1998) (stating that "a future injunction is not made retrospective merely because it recognizes that an ongoing violation of law is the result of a past wrong.”).

. See id. at 75 n. 17, 116 S.Ct. 1114 (distinguishing between statutes expressly permitting suit against specific state officials and those allowing suit only against “the State”).

. The state defendants additionally argue that the Act's judicial review provision does not provide for injunctive relief, thereby further enlarging the gap between relief under the Act and that provided by Young. The Act simply authorizes federal courts to review only to ensure that any "agreement or statement meets the requirements of” the 1996 Act. Id. Although the only case in this circuit to have construed the Act's judicial review provision, Southwestern Bell Telephone Co. v. Public Utility Commission, 208 F.3d 475 (5th Cir.2000), did not involve the Eleventh Amendment, we did indicate an inclination to adopt a "broader view” of the provision. See id. at 481-82 (construing the Act to permit review of state commissions for compliance with state law, under the arbilrary-and-capri-cious standard, in addition to de novo review of compliance with Act). A natural reading of the text is that it defines merely the scope of state conduct subject to judicial review, rather than the available remedies, and that our authority to enforce compliance reasonably includes the availability of injunctive relief— albeit only against the state commission and not its commissioners. See Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (slat *654 ing that "although we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise”) (citation omitted).

. See Currie, 72 N.Y.U. L. Rev. at 550 ("That said, the application of [this] principle in Seminole Tribe makes no sense. The majority held Ex parte Young precluded by a provision it had just declared unconstitutional — the section authorizing suit against the state itself. One of the essential characteristics of unconstitutional provisions is that they have no effect. Moreover, the inability to make the state suable removes the only plausible basis for believing that Congress would have wanted to forbid suit against the Governor under Ex parte Young .... [T]he last thing that Congress would have wanted was to leave the offended party with no remedy at all.”).

. See Seminole Tribe, 517 U.S. at 75-76, 116 S.Ct. 1114 ("Here, of course, we have found that Congress does not have authority under the Constitution to make the State suable in federal court under § 2710(d)(7). Nevertheless, the fact that Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under Ex parte Young strongly indicates that Congress had no wish to create the latter under § 2710(d)(3). Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known that § 2710(d)(7) was beyond its authority. If that effort is to be made, it should be made by Congress, and not by the federal courts. We hold that Ex parte Young is inapplicable to petitioner's suit against the Governor of Florida, and therefore that suit is barred by the Eleventh Amendment and must be dismissed for a lack of jurisdiction.”).

. "If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.” 47 U.S.C. § 252(e)(4).

. See Coeur d’Alene Tribe, 521 U.S. at 270-74, 117 S.Ct. 2028 (Kennedy, J., joined by Rehnquist, C.J.).

. See id. at 291-92, 117 S.Ct. 2028 (O’Connor, J., joined by Scalia and Thomas, JJ., concurring).

. See id. at 294, 117 S.Ct. 2028 (O’Connor, J., joined by Scalia and Thomas, JJ., concurring) (opining that "a Young suit is available where a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective”); id. at 298-99, 117 S.Ct. 2028 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ., dissenting) (same).

. See College Sav. Bank, 527 U.S. at 680, 119 S.Ct. 2219 ("We think that the constructive-waiver experiment of Farden was ill conceived, and see no merit in attempting to salvage any remnant of it.... Whatever may remain of our decision in Farden is expressly overruled.").

. In College Savings Bank, however, the Court distinguished waivers induced under the Compact and Spending Clauses on the ground that Congressional approval of interstate compacts and disbursement of federal funds to the states are matters of Congressional gratuity and do not improperly interfere with a state's ability to conduct otherwise lawful activity. Id. at 686, 119 S.Ct. 2219 (citing Petty v. Tenn.-Mo. Bridge Comm’n, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959) (Compact Clause), and South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (Spending Clause)).

. See Dole, 483 U.S. at 207, 107 S.Ct. 2793 (holding that "if Congress desires to condition the States’ receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation") (citations omitted); Atascadero, 473 U.S. at 247, 105 S.Ct. 3142 (holding that the Rehabilitation Act "falls far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity”).

. See AT&T Corp., 525 U.S. at 379 n. 6, 119 S.Ct. 721 (“But the question in these cases is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has.”).

. See FERC v. Mississippi, 456 U.S. 742, 764, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (noting that "the commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities”); Hodel v. Va. Surface Mining & Reclamation Ass’n, 452 U.S. 264, 290, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) ("A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activity affecting interstate commerce”).

. See FERC, 456 U.S. at 765, 102 S.Ct. 2126 (stating that, because "Congress could have pre-empted the field,” statutes "should not be invalid simply because, out of deference to state authority, Congress adopted a less intrusive scheme and allowed the States to continue regulating in the area on the condition that they consider the suggested federal standards”); New York v. United States, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (observing that "[w]e have recognized Congress' power to offer States the choice of regulating [commercial] activity according to *658 federal standards or having state law preempted by federal regulation”).

. See Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); New York v. United States.

. The majority’s erroneous disposition of the other issues on appeal rendered unnecessary a discussion by the majority of this indispensable-party issue.

. See Fernandes v. Limmer, 663 F.2d 619, 636 (5th Cir.1981) ("Courts confronted with motions to dismiss a suit for failure to join purportedly ‘indispensable parties' properly approach the problem pragmatically.”); Schutten v. Shell Oil Co., 421 F.2d 869, 873 (5th Cir.1970) ("The 1966 amendment of Rule 19 attempts to remedy this situation by conditioning a finding of ‘indispensability’ upon ‘pragmatic considerations.’ ”) (citation omitted).