**MILLENNIUM ONE COMMUNICATIONS, INC., Plaintiff,**

v.

**The PUBLIC UTILITY COMMISSION OF TEXAS, Rebecca Klein, in Her Official Capacity as Chairman of the Public Utility Commission of Texas, Julie Caruthers Parsley, in Her Official Capacity as Commissioner of the Public Utility Commission of Texas, and Southwestern Bell Telephone, L.P., Defendants.**

No. A–03–CA–893–LY.

United States District Court, W.D. Texas, Austin Division.

March 18, 2005.

Timothy J. Herman, Herman, Howry & Breen, L.L.P., Christopher Malish, Foster & Malish, LLP, Austin, for Millennium One Communications, Inc., plaintiff.

Kristen L. Worman, Texas Attorney General's Office, Natural Resources Division, John R. Hulme, Office of the Attorney General, Austin, Cynthia F. Malone, Attorney at Law, Southwestern Bell Telephone Company, San Antonio, Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, Geoffrey M. Klineberg, Scott H. Angstreich, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, Geoffrey Amsel, Attorney at Law, Southwestern Bell Telephone Company, for the Public Utility Commission of Texas, Rebecca Klein, In Her Official Capacity As Chairman of the Public Utility Commission of Texas, Julie Caruthers Parsley, In Her Official Capacity as Commissioner of the Public Utility Commission of Texas, Southwestern Bell Telephone, L.P., defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

YEAKEL, District Judge.

BE IT REMEMBERED that on July 28, 2004, this Court called the above-styled case for trial. Plaintiff Millennium One Communications ("Millennium One") appeared by counsel; Defendants The Public Utility Commission of Texas and the individual Commissioners (hereinafter referred to collectively as the "PUC") appeared by counsel; and Defendant Southwestern Bell Telephone, L.P. doing business as SBC Texas ("SBC") appeared by counsel. Also before the Court is The Public Utility Commission of Texas and Commissioners' Motion for Summary Judgment filed June 1, 2004 (Doc. # 27). In this action, Millennium One requests this Court to set aside an order of the PUC. Having carefully considered the evidence in the PUC record and the case law applicable to this action, this Court declines to do so and affirms the PUC's order for the reasons that follow.

### Jurisdiction and Venue

■ This cause of action arises under Section 252(e)(6) of the Federal Telecommunications Act of 1996, which provides that "[i]n any case in which a State com-

mission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section [252]." 47 U.S.C. § 252(e)(6) (2001). State utility commissions have the authority to address state-law questions relating to the interpretation and enforcement of previously approved interconnection agreements such as the one at issue in this case. *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 208 F.3d 475, 480 (5th Cir.2000). Federal district courts have jurisdiction to review such decisions. *Id.* at 480 (citing *Iowa Util. Bd. v. FCC,* 120 F.3d 753, 804 & n. 24 (8th Cir.1997), *aff'd in part, rev'd in part on other grounds, AT & T Corp. v. Iowa Util. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (holding that review under section 252(e)(6) is exclusive means of obtaining review of state enforcement decisions for interconnection agreements)). This Court has supplemental jurisdiction over state-law claims because they arise out of the same case or controversy.[1] *See* 28 U.S.C. § 1367(a) (1993). Venue is proper because Defendants reside in the Austin Division of the United States District Court for the Western District of Texas. *See* 28 U.S.C. § 1391(b) (Supp.2004).

### Regulatory Background

Congress passed the Federal Telecommunications Act of 1996 ("FTA"), 47 U.S.C. §§ 151–615b (2001 & Supp.2004), to open local telecommunications markets to competition. The FTA requires incumbent local exchange carriers ("ILECs") to allow their new competitors, called competitive local exchange carriers ("CLECs"), to resell "at wholesale rates any telecommunications service that the [ILEC] provides at retail." 47 U.S.C. § 251(c)(4) (2001). By reselling an ILEC's retail services, a CLEC can offer telecommunications services to customers without building its own telephone network.

ILECs and would-be CLECs are required to negotiate in good faith an "interconnection agreement," setting forth the terms under which they will operate. *Id.* at § 251(c)(1). The parties may decide to incorporate the requirements of federal law in their agreement, but also are permitted to "negotiate and enter into a[n] ... agreement ... without regard to the standards" established in the FTA. *Id.* at § 252(a)(1). If the parties cannot agree, either party may petition the state commission to arbitrate any open issues. *See id.* at § 252(b). In such an arbitration, the state commission must resolve those issues in accordance with the requirements of federal law. *See id.* at § 252(c).

Secondly, a CLEC may also exercise its right to "opt in" to any of the ILEC's existing interconnection agreements with other CLECs and take one of those agreements as its own, without ever negotiating with the ILEC. *See id.* at § 252(i) ("A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and

---

1. Relying on *Southwestern Bell Telephone Co. v. Public Utility Commission,* 208 F.3d 475, 480 (5th Cir.2000), the parties agree that jurisdiction lies with this Court under the umbrella of the applicable provisions of the Federal Telecommunications Act of 1996. *See* 47 U.S.C. §§ 151–615b (2001 & Supp.2004). However, this Court notes that because this

cause involves only issues of state law regarding the interpretation of the interconnection agreement between the parties, it can be distinguished from *Southwestern Bell,* thereby arguably raising a jurisdictional issue. Because the parties agree that this Court has proper jurisdiction, however, this Court declines to address the issue *sua sponte.*

conditions as those provided in the agreement.").

Regardless of how the interconnection agreement is formed, the final version must be submitted to the state commission for its review and approval. *See id.* at § 252(e)(1), (4). A party aggrieved by a state-commission decision approving or rejecting an agreement may seek review of that determination in federal court. *See id.* at § 252(e)(6).

Finally, state commissions possess the authority under federal law to interpret and enforce an agreement if a dispute arises after that agreement has been approved. *See, e.g., Southwestern Bell,* 208 F.3d at 479–80. In such post-approval dispute cases, the state commission must "interpret existing [agreements] according to their own terms"; state commissions violate "the [FTA]'s requirement that interconnection agreements are binding on the parties" if they issue an order that "effectively changes the terms" of those agreements. *Pacific Bell v. Pac–West Telecomm, Inc.,* 325 F.3d 1114, 1125–26, 1127 (9th Cir.2003).

Recognizing its authority to conduct these distinct types of proceedings, the PUC has established two sets of procedural rules. One set of rules governs proceedings in which the PUC is called upon to interpret the terms of an existing interconnection agreement. *See* 16 TEX. ADMIN. CODE §§ 22.321–.328 (2004) (Public Utility Commission of Texas Procedural Rules, Post–Interconnection Agreement Dispute Resolution). The other set of rules governs proceedings for arbitration to resolve open issues for the purpose of creating a new interconnection agreement. *See id.* at §§ 22.301–.310 (Public Utility Commission of Texas Procedural Rules, Dispute Resolution).

*Facts*

This case involves the resale of SBC services pursuant to an agreement be-tween SBC (the ILEC) and Millennium One (the CLEC) (the "Resale Agreement"). The Resale Agreement was based upon a preexisting agreement between SBC and Rosebud Telephone Company (the "Rosebud contract") that Millennium One chose to "opt" into, *i.e.,* adopt as its own agreement with SBC, in 1999 pursuant to the FTA. *See* 47 U.S.C. § 252(i). The terms of the Resale Agreement were set by the Rosebud contract that Millennium One adopted.

At first Millennium One used manual processing through SBC to make changes in its end-user customers' resold service. Manual processing, or manual service ordering, requires a Millennium One employee to directly contact an SBC employee to request that SBC employee to enter the new customer account information into SBC's system and "flip the switch" to initiate service for a new Millennium One customer. After several months, however, Millennium One started using SBC's electronic computer interface to process its service orders. Electronic service ordering allows a Millennium One employee with special training in SBC's systems to input the new customer account information directly into SBC's network using an electronic interface in order to initiate service. Electronic service ordering does not require direct contact with a SBC employee.

Sometime after Millennium One started using SBC's electronic processing service, it began to complain about the charges SBC assessed for certain service orders processed through SBC's electronic computer interface. In April 2002, Millennium One filed a formal complaint with the PUC alleging SBC was overcharging by billing for electronic order processing at a rate that Millennium One claimed should apply only to manual processing. The PUC's staff arbitrators issued an award finding

that the Resale Agreement did not include a price for the electronic orders. The staff imported a price for these orders from the PUC's 2002 *Accutel* arbitration award.[2] On appeal, however, the PUC reversed the arbitrators' award, finding instead that the Resale Agreement provided rates covering both electronically and manually processed orders. The PUC specifically reversed the arbitrators' award on the contract-interpretation issue and the importation of the *Accutel* rate, finding that the Resale Agreement itself provided a single set of rates for covering both electronically and manually processed orders, and therefore it was not appropriate for the PUC to supply prices for electronic ordering. Tex. Pub. Util. Comm'n, *Millennium One Communications, Inc. v. Southwestern Bell Tel.*, Docket No. 25779, at 4 (Sep. 11, 2003) (Order Approving, in Part, and Reversing, in Part, Arbitration Award with Modifications). Millennium One now appeals the PUC's decision to this Court pursuant to the FTA. *See* 47 U.S.C. § 252(e)(6).

### Standard of Review

In *Southwestern Bell*, the Fifth Circuit held that "considering *de novo* whether the agreements comply with Sections 251 and 252, and reviewing 'all other issues' under an arbitrary-and-capricious standard" is proper when reviewing the PUC's determinations in an interconnection agreement between an ILEC and CLEC. *Southwestern Bell*, 208 F.3d at 482. As in *Southwestern Bell*, the "other issues" in this case involve state-law claims. This Court, therefore, may review *de novo* whether the Resale Agreement as interpreted by the PUC meets the requirements of the FTA and review the findings themselves under the more deferential arbitrary-and-capricious standard.

### Issue

The parties do not raise the issue of whether the Resale Agreement meets the requirements of the FTA in this cause. Therefore, the sole issue before this Court is whether the PUC acted arbitrarily and capriciously when it determined under Texas law that the Resale Agreement between Millennium One and SBC included prices for electronically processed service orders.

### Findings and Conclusions

■ The PUC found "that the Resale Agreement sufficiently addresses pricing terms for electronic ordering for new service order, move orders, change orders and customer-initiated suspension/restoral service orders." September 11, 2003 Order of the Pub. Util. Comm'n, Docket No. 25779 at 3 (hereinafter referred to as the "PUC Order"). With respect to Millennium One's orders to resell SBC's retail services, the PUC noted that section II.C.2 of the Resale Agreement sets the rate for "all non-recurring service connection charges, excluding the conversion charge" by referring to the discounted rate listed in Exhibits A and B of the Resale Agreement. The PUC determined that Exhibits A and B establish "the avoided cost discount of 21.6% [a discount to the tariff a SBC retail customer would have paid] as the price for such services ... irrespective of whether the resold service is the result of electronic or manual ordering." *Id.* The PUC further determined that "§ I.C. of the Resale Agreement, like § XXXII, [of the Resale Agreement] refers all other pricing terms

---

**2.** In *Accutel* the PUC determined a price for electronic ordering based upon the FCC's Total Element Long Run Incremental Cost pricing for "unbundled network elements," applying the FTA pricing standards. Tex. Pub. Util. Comm'n, *Petition of Accutel of Texas,* *Inc. dba 1–800–A–Phone and Southwestern Bell Telephone Co. for arbitration pursuant to Section 252(b) of the Communications Act of 1934,* Docket No. 24547 (May 16, 2002) (Order Approving Accutel Arbitration Award).

to those in the SBC [ ] tariff," and "also does not distinguish between services that are ordered electronically or manually." *Id.* The PUC explained that section XXXII of the Resale Agreement "contemplated that the SBC Tariffs and the exhibits to the agreement will address all applicable rates to be paid by Millennium, regardless of the order process medium." *Id.* The PUC then concluded that "the express terms of the [Resale Agreement] provide for the avoided cost discount of 21.6% for service order charges where orders are processed electronically, and further held that having determined that there was no 'open' or 'missing' term in the Resale Agreement, the PUC 'is not authorized under the Federal Telecommunications Act of 1996(FTA) §§ 252(b)(1) and (c) to substitute the $2.58 rate found in Accutel and obligated to abide by the parties' negotiated terms." *Id.* at 4.

The pertinent sections of the Resale Agreement are as follows:

I. *DESCRIPTION AND CHARGES FOR SERVICES*

 C. SWBT shall make available for resale by CLEC the following SWBT services at SWBT's tariffed rate for each service (or in the event a service is not tariffed, at the rate SWBT charges its subscribers, except as otherwise provided herein):

 — Construction Charges

 — Connections with Terminal Equipment and Communication System

 — Distance Learning

 — Maintenance of Service Charges

 — Suspension Services

 — Telecommunications Service Priority Systems

 — Access Services

 — Cellular Mobile Telephone Interconnection Services

 — Exchange Connection Services

 — Shared Tenant Service

 — 976 Information Delivery Service

\* \* \* \* \* \*

II. *TERMS AND CONDITIONS FOR RESALE OF SERVICES*

 C. *Network and Service Order Conditions*

 2. When CLEC converts an end user currently receiving noncomplex service from the SWBT network, without any changes to SWBT's network, and such order requires manual processing by SWBT personnel, CLEC will be charged an interim per order (i.e., per billable telephone number) *conversion* charge of $16.65 in Texas. Conversion orders processed and completed electronically will be charged $5 per order on an interim basis. Complex orders will be charged at an interim rate of $52.55 per order. Customer Services conversions (e.g., Plexar Custom) will be handled on a Customer Specific Proposal basis.

When CLEC converts an end user's service and adds or changes are made to the network, the respective conversion charge will apply, as well as any normal service order charges associated with said changes. All non-recurring service connection charges, excluding the conversion charge mentioned above, will be charged at a discount for those services listed in Exhibits A and B.

\* \* \* \* \* \*

XXXII. *COMPLETE TERMS*

This Agreement, together with its exhibits constitutes the entire agreement between the Parties and supersedes all prior discussions, representations or oral understandings reached between the Parties.

The corresponding tariffs and this Agreement (including the exhibits) contain all of the applicable rates and charges to be paid by the CLEC to SWBT in connection with SWBT's provision of telecommunications service to CLEC for Resale to its end user customers.

Neither Party shall be bound by any amendment, modification or additional terms unless it is reduced to writing signed by an authorized representative of the Party sought to be bound. By their signatures in the space provided below, CLEC and SWBT indicate their acceptance of this Agreement. This agreement shall not bind CLEC and SWBT until executed by both Parties. This Agreement will be governed by and interpreted in accordance with the laws of the State of Texas.

 *See* Resale Agreement §§ I.C., II.C., XXXII. Section XXXII of the Resale Agreement contains a choice of law provision stating that the Resale Agreement will be governed by and interpreted under Texas law. Under Texas law, unambiguous contracts are enforced as written. *See Cardwell v. Sicola–Cardwell,* 978 S.W.2d 722, 727 (Tex.App.-Austin 1998, pet. denied) (citing *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984)). "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996). If contract language can be given a certain or definite meaning, then it is not ambiguous; it should be interpreted by a court as a matter of law. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999). Lack of clarity does not create an ambiguity, and "[n]ot every difference in the interpretation of a contract ... amounts to an ambiguity." *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994). Rather, an ambiguity arises when an agreement is susceptible to more than one reasonable meaning after application of established rules of construction. *DeWitt County Elec. Coop., Inc.,* 1 S.W.3d at 100.

*Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.,* 121 S.W.3d 742, 746 (Tex.2003).

Millennium One contends that the Resale Agreement does not include a rate for electronic service ordering and that because the rate is missing, the holding in *Accutel* applies. In *Accutel,* the federal district court upheld the PUC's price determination for electronic ordering, using FTA pricing standards. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* No. 02–CV–571 (W.D.Tex. July 9, 2003) (order regarding motions for summary judgment at 17). Millennium One argues that the language in the Resale Agreement at issue in this case is similar to that in *Accutel,* and asserts that the federal district court in *Accutel* held that the same contract language did not dispose of electronic new service ordering. Specifically, Millennium One argues that the general retail tariff referenced in the Resale Agreement does not encompass the electronic new-service orders. Thus, Millennium One concludes that because the Resale Agreement does not contain specific provisions setting out the rate for electronic new-service orders, the price for these orders must be supplied by the PUC as was ordered by the district court in *Accutel.*

Millennium One's reliance on *Accutel* is misplaced. In *Accutel*, the district court did not review the contract language because under the facts of that case the PUC's decision did not involve the interpretation of existing contract language. The district court addressed solely the question of whether the PUC properly interpreted federal law. *See id.* at 9 ("Court ... examines the [PUC] order to see whether it violates federal law, as reflected in the [FTA]"). In other words, *Accutel* did not involve the interpretation of the terms of Accutel's then-existing agreement with SBC to determine what rates were provided for in that agreement and whether any rates were missing. Instead, SBC and Accutel agreed to arbitrate new rates under the same rules that would apply in a proceeding to create a new interconnection agreement. As the arbitrators in *Accutel* expressly recognized, because the question of the appropriate rate for processing electronically submitted orders "was opened up by a mutual agreement to arbitrate," the "outcome of [the] proceeding [was] not based upon the construction or interpretation of existing contract language." Accutel Arbitration Award at 12.[3]

Indeed, the *Accutel* arbitrators expressly rejected SBC's attempt to rely on a prior PUC decision in a proceeding involving AT&T that, like the dispute with Millennium One, involved the interpretation of the terms of an existing agreement. *See id.* The arbitrators explained that, because "Accutel and [SBC] ha[d] engaged in negotiations with regard to an amendment to the existing interconnection agreement," the "context, issue, and purpose of this proceeding b[ore] no resemblance to those in" the earlier case interpreting the terms of the existing agreement between SBC

and AT&T. *Id.* Thus, when the arbitrators in *Accutel* held that the appropriate rate for processing two types of electronically submitted orders to resell SBC's retail services was $2.58, the arbitrators were supplying a new pricing term to a new agreement by interpreting and applying federal law.

In affirming the arbitrators' decision, the PUC likewise made a ruling as to federal law, finding that the arbitrators' conclusions were "consistent with 47 U.S.C. §§ 251 and 252." Order Approving Accutel Arbitration Award at 4.[4] The federal district court then affirmed the PUC's interpretation of federal law. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n*, No. 02–CV–571 (W.D.Tex. July 9, 2003). Like the arbitrators and the PUC, the district court did not purport to interpret the terms of the agreement between Accutel and SBC. Instead, the district court focused entirely on the question whether the PUC properly interpreted federal law. *See id.*, slip op. at 9. This Court rejects Millennium One's assertion that the PUC's decision in *Accutel* and the federal district court's decision affirming the PUC's interpretation of federal law in that case controls the outcome of the case now before this Court.

█ Unlike *Accutel* this case involves the interpretation of an *existing* interconnection agreement between Millennium One and SBC. Section 252(a)(1) of the FTA provides in pertinent part that "an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251," 42 U.S.C. § 252(a)(1).

---

**3.** Arbitration Award, *Arbitration for Interconnection Between 1–800–4–A–PHONE and Southwestern Bell Telephone Co.*, Docket No.

24547 (Tex. PUC filed Jan. 25, 2002) (Accutel Arbitration Award).

**4.** *See supra* note 2.

Thus, ILECs and CLECs may agree to whatever terms they wish in their fully negotiated interconnection agreement without regard to the federal standards. *See Coserv Ltd. Liab. Corp. v. Southwestern Bell Tel. Co.*, 350 F.3d 482, 485 (5th Cir.2003). Millennium One "opted in" to an existing interconnection agreement, the Rosebud Agreement. When Millennium One and SBC submitted their Resale Agreement to the PUC for approval, they jointly represented that there were no outstanding issues between them at that time *See* Joint Application for Approval of Interconnection Agreement, Docket No. 22512 (Tex. PUC filed May 8, 2000).

Section II.C.2 of the Resale Agreement provides that the order-processing charge, which is one of a number of nonrecurring charges that Millennium One pays when it places resale orders, is calculated by taking the rate that an SBC retail customer would have paid (found in the general retail tariff referenced in the Resale Agreement) less the discount specified for all nonrecurring charges in Exhibit A or Exhibit B of the Resale Agreement. As the PUC found, except as to conversion orders, section II.C.2 does not distinguish in any way between electronic and manual order processing. PUC Order at 3. Further, it does not distinguish between the ordering options available to SBC's retail customers and those available to Millennium One.

Millennium One interprets section II.C.2's establishment of a pricing rule for "*all* non-recurring service connection charges" (other than conversion orders) to apply to manually submitted orders only. The PUC found otherwise. Given the parties' express creation of separate charges for processing conversion orders, which depend on whether an order is submitted manually or electronically, this Court finds that the natural reading of section II.C.2 is that the parties meant for the same order

processing charge to apply to all other orders, however submitted. Indeed, section XXXII of the Resale Agreement, which states that the corresponding tariffs and the exhibits to the Resale Agreement contain all of the applicable rates to be paid by Millennium One to SBC, supports the PUC's findings.

Millennium One also argues that sections I.A and I.C and Exhibits A and B of the Resale Agreement do not support the PUC's conclusion because those sections and exhibits do not contain a line-item for "electronic new service ordering." However, as Defendants' correctly point out, these provisions apply to all "non-recurring charges" associated with the services that Millennium One purchases from SBC. The facts show that the charge for processing orders that Millennium One submits is a non-recurring charge associated with the service that Millennium One has ordered, whether Millennium One places its order manually or by using SBC's electronic processing interfaces. Thus, what Millennium One orders and then resells to its customers is a telephone service, not "electronic ordering," and the order processing charge is one of the charges that applies when telephone service is ordered. Accordingly, this Court concludes that the PUC's interpretation was not arbitrary and capricious.

### Conclusion

This Court therefore concludes that the PUC did not act arbitrarily and capriciously when it determined that the Resale Agreement between Millennium One and SBC included prices for electronically processed service orders. In accordance with the foregoing:

**IT IS ORDERED** that the September 11, 2003 Order of the Public Utility Commission of Texas, Docket No. 25779, assessing Millennium One Communications a wholesale discount rate of 21.6% for elec-

tronic and manual order processing as provided in the agreement between Millennium One Communications and Southwestern Bell Telephone, L.P. is **AFFIRMED**.

**IT IS FURTHER ORDERED** that all other pending motions, including the Public Utility Commission of Texas and Commissioners' Motion for Summary Judgment filed June 1, 2004 (Doc. # 27), are **DISMISSED**.

**IT IS FINALLY ORDERED** that all further relief not expressly granted is **DENIED**.