United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 4, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 05-50131

SOUTHWESTERN BELL TELEPHONE, L.P. d/b/a SBC TEXAS,

Plaintiff-Appellant,

versus

PUBLIC UTILITY COMMISSION OF TEXAS, PAUL HUDSON,
in his official capacity as chairman of the Public Utility Commission of Texas,
BARRY SMITHERMAN, in his official capacity as Commissioner of the
Public Utility Commission of Texas; JULIE C. PARSLEY, in her official
capacity as Commissioner of the Public Utility Commision of Texas;
and AT&T COMMUNICATIONS OF TEXAS, L.P.,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

Before KING, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Southwestern Bell Telephone, LP d/b/a SBC Texas appeals from the district court's grant of summary judgment to the Public Utilities Commission of Texas ("PUCT") and AT&T Communications ("AT&T"). The issue on appeal is whether the PUCT acted arbitrarily and capriciously in issuing Order No. 45, which modified the Performance Remedy Plan of the Texas 271

1

Agreement, without the consent of SBC Texas. SBC Texas contends that the PUCT violated federal law and breached a binding contract by altering the terms and conditions of the State's model interconnection agreement. The district court determined that Congress's grant of authority to state utility commissions includes the interpretation and enforcement of modifications to the agreement, and the PUCT did not exceed its authority in this instance. We AFFIRM the district court's judgment.

I.     Facts and Procedural Background

Under the Telecommunications Act of 1996, 47 U.S.C. §§ 251, 252 (the "Act"), the Federal Communications Commission (the "FCC") restructured local telephone markets. Prior to the Act, SBC Texas held a monopoly on local service throughout Texas pursuant to a certificate of convenience and necessity from the State or locality. Congress preempted these arrangements to allow the Bell companies to enter into the long-distance market in exchange for opening its local service monopolies to competition.

Before gaining access to the long-distance market, an incumbent local exchange carrier ("ILEC"), such as SBC Texas, must meet the requirements of a competitive checklist and submit an application demonstrating its ability to open its networks to competitors. *See* 47 U.S.C. §271(c)(2)(B). Both the state commission and FCC review an ILEC's application. Under §271(d)(2)(B) of the Act, the FCC consults with the state commission for a recommendation on whether to approve the ILEC's application, but the FCC ultimately determines whether an ILEC meets the competitive requirements.

During the application process, the ILEC may begin to enter into interconnection agreements with competitive local exchange carriers ("CLEC") through either negotiations or compulsory

arbitration. 47 U.S.C. §§ 251, 252. The state commission must then approve or reject the interconnection agreements. 47 U.S.C. §252(e)(1). Interconnection agreements set forth the terms and conditions for the ILEC and CLEC to fulfill their respective statutory duties. After approval, the state commission monitors the ILEC and CLECs for compliance with specified performance measures.

In July 1996, and again in May 1997, the PUCT instituted arbitration proceedings to solidify the terms of interconnection agreements between SBC Texas and various CLECs. Between the arbitrations, the PUCT initiated a separate proceeding, pursuant to section 271 of the Act, to determine whether SBC Texas satisfied the competitive checklist required as a precondition to entering the long-distance market. SBC Texas worked with the Justice Department, competitors, and the PUCT to create the list of performance measures necessary to receive a recommendation of approval for its application. In October 1999, the PUCT issued an order to require certain changes and approve the Texas 271 Agreement (the "T2A") as modified. Order No. 55, *Investigation of Southwestern Bell Telephone Company's Entry into the Texas InterLATA Telecommunications Market*, Project No. 16251 (Tex. PUC Oct. 13, 1999).

On December 16, 1999, the PUCT voted to recommend that the FCC approve SBC Texas's application. SBC Texas filed an application and supplement with the FCC. On June 30, 2000, the FCC approved SBC Texas's application; meaning, the FCC permitted SBC Texas to "enter the in-region, interLATA market in Texas based on evidence that SWBT [SBC Texas] ha[d] taken the statutorily required steps to open its local exchange access markets to competition." The order stated in pertinent part that:

3

As a result of the Texas Commission's efforts, competition has taken root, and is expanding in local telecommunications markets, which ultimately benefits consumers. The Texas Commission utilized a number of effective methods to ensure the local markets in Texas are open to competition today, and will remain so in the future... As part of its section 271 review, the Texas Commission also developed clearly defined performance measurements and standards, and adopted a performance remedy plan to discourage backsliding. In a continuing effort to refine and monitor performance measurements, the Texas Commission has a six month review process in place. The Texas Commission is currently considering modifying existing measurements and adding new measurements based on input from SWBT [SBC Texas] and competing carriers.

Memorandum Opinion and Order, FCC 00-238, *In the Matter of Application of SBC Communications Inc., et al.*, CC Docket No. 00-65, 15 F.C.C.R. 18, 354, 2000 WL 270853 (June 30, 2000)

Attachment 17 of the T2A contains the Performance Remedy Plan (the "Plan"). The Plan enumerates performance measures, which create standards to measure SBC Texas's performance in providing non-discriminatory access to its network. The Plan also mandates that SBC Texas pay automatic liquidated damages to affected CLECs for non-compliance with specified performance measures. The liquidated damages serve as an incentive for SBC Texas to fulfill its obligations under the interconnection agreements.

In the Plan, "K Values" limit the number of measures classified as non-compliant. Through random variation, a certain number of measures will indicate substandard performance even though SBC Texas's actual performance may be at parity or benchmark levels. To balance random variation and errors, the K Values permit a prescribed number of non-compliant performance measures before SBC Texas becomes liable for liquidated damages. For some performance measurements, the K exemption does not apply when SBC Texas was non-compliant in the prior two consecutive months, but the K exemption applies again after two consecutive months of compliance.

4

On October 17, 2002, the PUCT signed Order No. 45 (the "Order"). Order No. 45, *Section 271 Compliance Monitoring of Southwestern Bell Tel. Col. Of Texas*, Project 204000 (Oct. 17, 2002). The Order provides that the K exemption will not apply after one month of non-compliance; and the K Value will not include performance measures with less than ten transactions. The Order also included two other adjustments meant to ensure that the damage calculation accounts for the severity and volume of transactions with substandard performance. According to SBC Texas, the modifications increased the liquidated damages due to competitive carriers, regardless of whether the CLECs experienced comparable harm.

SBC Texas filed a motion to reconsider, asserting that SBC Texas did not consent to the K-Table modifications as required by §6.4 of the Plan, which provides that modifications require the mutual agreement of the parties. The PUCT denied this motion. SBC Texas then filed suit alleging that the PUCT violated 47 U.S.C. §§ 251 & 252 by ordering SBC Texas to alter certain terms and conditions of the Performance Remedy Plan, contained in binding interconnection agreements, that SBC Texas entered into with approximately 225 CLECs in Texas. The PUCT maintained that it issued the Order, pursuant to its compliance monitoring docket, to ensure the Plan operates as intended. The PUCT, AT&T, and SBC Texas, each filed motions for summary judgment.

The district court concluded that a previous FCC order, interpreting similar contractual language in other states, supported the PUCT's actions. Further, Congress granted state commissions the power to interpret and enforce, as well as approve or reject, interconnection agreements. Finding that the PUCT did not act arbitrary and capriciously, the district court granted the summary judgment motions filed by the PUCT and AT&T, and denied the motion filed by SBC Texas. SBC Texas moved to modify or alter the judgment. SBC Texas agreed with the district court's conclusion that

Congress's grant of power to state commissions included the power to interpret and enforce interconnection agreements; yet, SBC Texas reiterated that §6.4 of the Plan restricts the PUCT's authority and its refusal to reconsider the Order was arbitrary and capricious. The district court denied SBC Texas's request to set aside the summary judgments. The central issue in this appeal concerns whether the PUCT possessed authority to enforce modifications without SBC Texas's consent in light of §6.4 of the Plan.

II.     Standard of Review

A grant of summary judgment is reviewed de novo, applying the same standard as the district court. *Conserv LLC v. Sw. Bell Tel. Co.*, 350 F.3d 482, 486 (5th Cir. 2003). A district court reviews an interconnection agreement between an ILEC and CLEC, as interpreted by the state commission, for compliance with federal law and related matters of statutory interpretation de novo. *Id.*; *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 482 (5th Cir. 2000); *Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d 428, 433 (6th Cir. 2003); *Millennium One Comm'n., Inc. v. Pub. Util. Comm'n.*, 361 F.Supp.2d 634, 638 (W.D. Tex. 2005). If this review uncovers no illegality, whether the state commission correctly interpreted the challenged interconnection agreement and the determination of all other issues are reviewed under the arbitrary and capricious standard. *Sw. Bell Tel. Co.*, 208 F.3d at 482; *Millennium One*, 361 F.Supp.2d at 638.

III.    Discussion

A.

Neither SBC Texas nor the PUCT contend that the substance of Order No. 45's modifications violate the Act. In this appeal, SBC Texas only asserts that Order No. 45 exceeds the PUCT's authority under the plain language of the T2A, which prohibits unilateral changes.

6

B.

Now we must decide whether the PUCT's interpretation of §6.4 of the Plan, under Texas law, constitutes an arbitrary and capricious construction or stands unsupported by substantial evidence. Under this standard of review, the court may not "substitute its judgment for that of the agency. The agency must articulate a rational connection between the facts found and the choice made." *Bowman Transp. Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 285 (1974).

This Circuit has determined that "the Act's grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements that state commissions have approved." *Sw. Bell Tel. Co.*, 208 F.3d at 479-80. Thus, interpretation of an agreement is an authorized state commission determination under Section 252; and parties are bound by their interconnection agreements as interpreted and enforced by the state commission. *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1276 (11th Cir. 2003) (en banc)). On the other hand, a state commission cannot undercut the purpose of sections 251 and 252 via its general rule-making authority. *Pacific Bell v. PacWest Telecomm, Inc.*, 325 F.3d 1114 (9th Cir. 2003); *Verizon North, Inc. v. Strand*, 309 F.3d 935 (6th Cir. 2002).

The interconnection agreement and state law principles govern the interpretation and enforcement of agreement provisions. *Sw. Bell Tel. Co.*, 208 F.3d at 485. Under Texas law, unambiguous contracts are interpreted by a court as a matter of law. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). To determine whether a contract contains an ambiguity, the court must consider the contract as a whole in light of the circumstances present when the parties entered the contract. *Id.* (citing *Columbia Gas Transmission*

7

*Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). If the contract language reveals a certain or definite meaning, then it is not ambiguous and should be interpreted by a court as a matter of law. *Enterprise Leasing Co. of Houston v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; instead, both interpretations must be reasonable. *Columbia*, 940 S.W.2d at 589 (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)). If the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, then the contract is ambiguous, which creates a fact issue on the parties' intent. *Id.*

The T2A represents a collaborative effort between many interested parties to develop a model interconnection agreement. The PUCT's approval of the T2A symbolized a milestone in SBC Texas's pursuit to gain the PUCT's recommendation for FCC approval under section 271 of the Act. The T2A provides a contractual blueprint available to any CLEC operating in Texas and ensures nondiscriminatory access to SBC Texas's network. More specifically, the Plan's provisions demonstrated to both the PUCT and FCC that SBC Texas satisfied and would continue to satisfy the section 271 competitive checklist. Section 6.4 of Attachment 17 provides in pertinent part that:

> Every six months, CLEC may participate with SWBT [SBC Texas], other CLECs, and Commission representatives to review the performance measure to determine whether measurements should be added, deleted, or modified; whether the applicable benchmark standards should be modified or replaced by parity standards; and whether to move a classification of a measure to High, Medium, Low, Diagnostic, Tier-1 or Tier-2... Any changes to existing performance measures and this remedy plan shall be by mutual agreement of the parties and, if necessary, with respect to new measures and their appropriate classification, by arbitration. The current measurements and benchmarks will be in effect until modified hereunder or expiration of the interconnection agreement.

8

The plain language of the provision appears unambiguous. As argued by SBC Texas, §6.4 of the Plan leads one to assume that any modification of the remedy plan, including those affected by Order No. 45, require the PUCT to gain SBC Texas's consent. But under Texas law, we must consider the Plan's plain language in light of the surrounding circumstances at the time SBC Texas and the PUCT entered the contract.

The PUCT argues that §6.4 of the Plan imposes an obligation upon SBC Texas to participate in good faith in the six-month review process; attempt to reach agreements with the CLECs on any changes and additions to the existing performance measurements; and submit to binding arbitrations on new measures disagreed upon by SBC Texas and the CLECs. However, the mutual agreement language, under no circumstance, proscribes the PUCT from making modifications to fine-tune the Plan. Based on this premise, the PUCT modified the Plan's liquidated damages calculation to ensure that the payments accurately reflect substandard performance without unfairly penalizing SBC Texas due to the statistical random variation in the reported data.

The PUCT's interpretation of the contract provisions to permit minor modifications comports with the circumstances surrounding its approval of the T2A and the intent of the Plan. In the PUCT's evaluation to recommend that the FCC approve SBC Texas's application, the PUCT stated that:

> In addition, a six-month review process is in place to assure that the plan is not static in nature. The Texas Commission, in conjunction with SWBT [SBC Texas] and the CLECs, will engage in a comprehensive review of the performance measures to determine if commercial experience indicates that changes are necessary. In this way, the Texas Commission can carry out its goal of making sure that the process reflects new experiences and changes in the marketplace as competition continues to evolve.
>
> *In the Matter of Application by SBC Communications, Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance*, CC Docket No. 00-4.

9

In the FCC's order, which approved SBC Texas's application, the FCC wrote that:

> As noted in the Introduction, we accord the Texas Commission's verification of SWBT's compliance substantial weight based on the totality of its efforts and extent of its expertise on section 271 issues... The Texas Commission also developed a comprehensive performance measurement and remedy plan which it continues to monitor and refine.

> FCC Memorandum Opinion and Order, June 30, 2000.

These two written pronouncements, from the PUCT and FCC, indicate that the PUCT did not intend to surrender its power over modifying the terms and conditions of the Plan after approving the T2A. To the contrary, both the FCC and PUCT expressed an expectation for the PUCT to continually monitor SBC Texas's progress, and to refine the interconnection agreement as necessary to fulfill the goal of nondiscriminatory, competitive telephone markets. Further, neither statement mentions an obligation for the PUCT to collaborate with either the ILEC or the CLECs in pursuing the goal. In Order No. 45, the PUCT fine-tuned the Plan by honing the statistical methodology for measuring SBCTexas's compliance with established standards. The Order's modifications align with the underlying purpose of the K Value: to account for the random variation of reported data.

The Proposed Interconnection Agreement Matrix, which documents discussions conducted while drafting the T2A, also supports the PUCT's interpretation. The Matrix provides the following with respect to §6.4 of the Plan:

> SWBT [SBC Texas] Proposed Language and Rationale: SWBT does not agree with AT&T's other suggestions, which would alter the precisely defined scope of six-month reviews. The reason for the defined scope was to strike a balance between permitting necessary adjustment to the Plan, on the one hand, and avoiding wholesale major reviews on the other hand. As currently worded, and as approved by the Commission, this section allows sufficient scope to address any modifications. SWBT cannot agree to turning the six-month reviews into a complete revisitation of the Plan.

10

The Commission found that it agreed with "SWBT [SBC Texas] as to the scope of the six-month review; therefore, section 6.4 should remain unchanged." Under SBC Texas's interpretation, accepted by the PUCT, §6.4 of the Plan does not create an absolute preclusion to the PUCT making "necessary adjustments to the Plan." SBC Texas argues that its comments during the T2A review referred only to AT&T's proposed language, not the mutual agreement provision. The record, however, provides no indication that SBC Texas's comments are limited to AT&T's proposed language, as opposed to the entire section. For this reason, we cannot find, based on SBC Texas's assertion, that the PUCT acted arbitrary and capriciously by relying upon SBC Texas's representation at the time of drafting §6.4 of the Plan. To the contrary, SBC Texas's comments support the reasonableness of the PUCT's interpretation that the T2A permits it to fine-tune the Plan.

Order No. 45 follows a pattern of the PUCT making modifications to the T2A, as deemed necessary within the PUCT's discretion. As a result of the two six-month reviews prior to the third review, which produced Order No. 45, the PUCT modified the Plan over objections from the CLECs and SBC Texas. For example, in July of 2000, the PUCT eliminated thirty-one measures, added eighteen measures, and revised eighty-five measures. Order No. 13, *Section 271 Compliance Monitoring of Southwestern Bell Telephone Co. Of Texas*, Project No. 204000 (Tex. PUC July 19, 2000). Although SBC Texas opposed the changes to the performance measures, SBC Texas did not seek judicial review and did not file a motion to reconsider. SBC Texas's present argument, that the PUCT impermissibly made a unilateral change to the interconnection agreement, never arose after these modifications. SBC Texas argues that its decision not to seek judicial review implied the necessary consent. This argument fails to persuade the court in any definitive direction on the central issue. SBC Texas's decision to not seek a judicial appeal on previous unilateral modifications does

11

not prove that SBC Texas consented to the changes, nor does the decision preclude SBC Texas from filing suit pursuant to the contract. These facts demonstrate, however, that the PUCT did not act arbitrarily and capriciously when issuing Order No. 45; instead, the PUCT acted consistent with past conduct.

SBC Texas also argues that at the time of the third six-month review, SBC Texas's performance had improved dramatically over previous years. Therefore, the PUCT's decision to enhance the liquidated damages clause, despite SBC Texas's improvement, seems not only inconsistent with the T2A, but evidences the arbitrary and capricious nature of the PUCT's conduct. In reviewing the record, SBC Texas provides no comparative point of reference for its improved performance. We cannot glean whether SBC Texas's improvement means it is now doing an excellent job of complying with the performance measures, or it is barely satisfying the competitive checklist. Moreover, the Act permits state public utility commissions to modify interconnection agreements without seeking a substandard performance determination from the FCC as a prerequisite. Section 251(d)(3) of the Act explicitly states that:

> [T]he Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that establishes access and interconnection obligations of local exchange carriers; is consistent with the requirements of this section; and does not substantially prevent implementation of the requirements of this section and the purposes of this part.

And the FCC's Order approving SBC Texas's applications states that:

> We stand ready to exercise our various statutory enforcement powers quickly and decisively in appropriate circumstances to ensure that the local market remains open in Texas. We are confident that cooperative state and federal oversight and enforcement can address any backsliding that may arise with respect to SWBT's entry into the Texas long distance market.

> FCC Memorandum Opinion and Order, June 30, 2000.

12

The Act's language, and the FCC's recognition of the PUCT's role in maintaining an open market, support the PUCT's actions. The PUCT need not sit with its hands tied until SBC Texas commits an egregious violation, or until the FCC grants permission for select adjustments; instead, the PUCT can make refinements to the T2A as the occasion arises so long as the changes do not contravene the Act. Based on the surrounding circumstances at the time of drafting and approving the T2A, and evidence supporting the PUCT's rationale for Order No. 45, we find that the PUCT did not act impermissibly arbitrary and capricious.

IV.     Conclusion

In Order No. 45, the PUCT redefined the existing terms of the Remedy Plan in the Texas 271 Agreement. Order No. 45 creates neither new nor different contractual terms. Based on the circumstances surrounding the PUCT's approval of the T2A, we find that the PUCT's issuance of Order No. 45 was not arbitrary and capricious. Accordingly, we AFFIRM the district court's grant of summary judgment in favor of the PUCT.